[No. E040778. Fourth Dist., Div. Two. June 12, 2008.]

AMANDA LAABS, a Minor, etc., Plaintiff and Appellant, v. CITY OF VICTORVILLE, Defendant and Appellant.

**COUNSEL**

Lascher & Lascher, Wendy Lascher, Aris Karakalos; Richard Harris Law Firm and Richard Harris for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Christopher J. Workman and Lisa W. Cooney for Defendant and Appellant.

**OPINION**

**KING, J.—**

## I.  INTRODUCTION

Plaintiff Amanda Laabs was injured in an automobile collision. She sued various parties, including the County of San Bernardino (the County) and the City of Victorville (the City). As against these governmental entities, she alleged that her injuries were caused by a dangerous condition of public property for purposes of Government Code sections 830 and 835.[1] The City moved for summary judgment, which the court granted. The court subsequently denied the City's motion for defense costs (pursuant to Code Civ. Proc., § 1038) and expenses incurred in proving matters that plaintiff had denied (pursuant to Code Civ. Proc., § 2033.420). Following the denial of plaintiff's motion for new trial and the entry of judgment, plaintiff appealed. The City appealed from the court's denial of its motion for defense costs and expenses.

We affirm both the trial court's grant of summary judgment as well as its denial of the City's motion for defense costs and expenses.

## II.  STATEMENT OF FACTS

The following facts are, in essence, uncontroverted and taken from the evidence submitted by the parties in support of, and in opposition to, the motion for summary judgment.[2]

Ridgecrest Road (Ridgecrest) is a four-lane north/south roadway with a posted speed limit of 55 miles per hour. It intersects with Pebble Beach Drive

---

[1] All further statutory references are to the Government Code unless otherwise indicated. Section 835 provides: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

Section 830, subdivision (a), defines "dangerous condition" to mean "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used."

[2] All of the facts presented in this opinion come solely from the evidence presented in connection with the City's motion for summary judgment.

(Pebble Beach), a two-lane east/west roadway. Westbound Pebble Beach has a stop sign, a painted limit line, and "STOP" painted on the roadway.

Pebble Beach, which has no centerline delineation, passes through a portion of the Spring Valley Lake residential area. Ridgecrest runs along the west side of the Spring Valley Lake development. There is a block wall along the east side of Ridgecrest, just to the south of Pebble Beach. The block wall is about 10 feet east of the curb and runs parallel with Ridgecrest; at its north end, it turns easterly to run along a small portion of the south side of Pebble Beach.

The subject automobile accident occurred when a northbound vehicle on Ridgecrest collided with a westbound vehicle turning left from Pebble Beach onto southbound Ridgecrest. The northbound vehicle, a Porsche Carrera, was driven by James Dimeo. The left-turning vehicle, a Mitsubishi, was driven by Dorothy Specter. The impact occurred within the northbound lanes of Ridgecrest.

In 1996, Ridgecrest was widened to the west. Added were the southbound lanes of Ridgecrest consisting of two 12-foot lanes and a 12-foot-wide two-way left turn lane. The County retained ownership, control, and responsibility for the northbound lanes of Ridgecrest; the City annexed the west side and acquired control and maintenance responsibility for the southbound lanes. The as-built plans show the northbound lanes as being County property and the southbound lanes as being owned and controlled by the City.

At its intersection with Ridgecrest, Pebble Beach has a 6 to 8 percent uphill grade in a westerly direction and a 5 percent downgrade to the north. South of its intersection with Pebble Beach, Ridgecrest is an undulating roadway with a 280-foot vertical curve just to the south of the intersection.

At the time of the accident, the driver of the northbound Porsche, James Dimeo, was accompanied by Jason Moffett and plaintiff. Just before the accident, they planned to go to In-N-Out Burger. Initially, Dimeo proceeded southbound on Ridgecrest towards Bear Valley Highway. His vehicle at times reached a speed of 100 miles per hour. At some point near a church parking lot, Dimeo made a U-turn and began proceeding northbound on Ridgecrest.

Witness Kevin Vidana-Barda testified that as he was proceeding northbound on Ridgecrest, south of the accident site, the Porsche passed him, traveling anywhere from 100 to 120 miles per hour.[3]

---

[3] While not specific in terms of location, Jason Moffett, a passenger in Dimeo's car, testified in his deposition that at one point he did see the speedometer of the Porsche reach over 120 miles per hour.

Dimeo testified in his deposition that the Mitsubishi "pulled out right in front of" him. The Mitsubishi was crossing Ridgecrest from westbound Pebble Beach. He did not know how much time passed between the time he first saw the Mitsubishi and the time of impact. He was in the right-hand lane just before the impact. He was able to move his foot to the brake and steer the car into the left-hand lane before impact. He did not know the positions of the vehicles at the time of impact.

Dorothy Specter, the driver of the Mitsubishi, indicated that she stopped at the stop sign, looked both ways and saw nothing coming. She eased forward and again looked both ways and saw nothing coming. She pulled into the intersection to make a left-hand turn to go south on Ridgecrest. Suddenly, a vehicle struck the front of her vehicle. She never saw the other car coming. In a statement to the investigating officer, Specter gave no indication that her line of sight was obstructed.

Dimeo said that he had driven this part of Ridgecrest "every day," and "hundreds of times." He normally drives an elevated truck and never had difficulty seeing cars at the Pebble Beach intersection. In the lower Porsche, however, he said he could not see the westbound car at the intersection.

Keith Friedman, an expert, opined that based on his preliminary analysis, the Porsche was going 74 miles per hour at impact. After this initial impact, the Porsche spun around 270 degrees moving in a northwesterly direction. The Porsche partially jumped the western curb of Ridgecrest and slid northerly along the curb, striking and knocking over a light pole; the pole was located on the sidewalk adjacent to the southbound lanes. It had been installed within the City right-of-way, approximately one foot west of the western curb face of Ridgecrest.

Other evidence submitted by way of lay witnesses and expert declarations will be discussed within the context of our analysis.

### III.   PROCEDURAL BACKGROUND

In her first amended complaint, plaintiff asserts a cause of action for "premises liability" based on the theory, among others, that her injuries were caused by a dangerous condition of public property for purposes of sections 830 and 835. Specifically, plaintiff alleged: "There was inadequate sight distance so that Specter did not perceive the approaching Dimeo vehicle which struck the Specter vehicle. Based upon information and belief, the [City] is responsible for the design, construction, maintenance and conrol

[*sic*] of the southbound lanes of Ridgecrest Road. Based upon information and belief, [County] is responsible for the northbound lanes of Ridgecrest Road. Defendants [City] and [County] were negligent in designing, constructing, maintaining, controlling and otherwise creating and failing to correct dangerous road conditions due to inadequate sight distance and lack of warning signs, devices and signals."

The City moved for summary judgment on the following grounds: The City did not own or control northbound Ridgecrest, the Ridgecrest-Pebble Beach intersection was not in a dangerous condition as a matter of law, the City is entitled to design immunity under section 830.6, and the City is entitled to immunity for failure to provide traffic or warning signals, signs, markings, or devices under section 830.8.

In addition to opposing the City's asserted grounds for summary judgment, plaintiff argued that the placement of the light pole, or luminaire, on the west side of Ridgecrest constituted a dangerous condition that contributed to the severity of plaintiff's injuries.

Following a hearing, the court granted the motion for summary judgment. Subsequently, the court denied the City's motion for defense costs and expenses.

## IV. ANALYSIS

### A. *Standard of Review*

A moving party defendant is entitled to summary judgment if it establishes a complete defense to the plaintiff's cause of action, or shows that one or more elements of the cause of action cannot be established. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493].) The moving party bears the burden of persuasion that there is no triable issue of material fact. Additionally, the moving party bears the initial burden of production to make a prima facie showing that no triable issue of material fact exists. Once the initial burden of production is met, the burden shifts to the responding party to demonstrate the existence of a triable issue of material fact. (*Id.* at pp. 850–851.) "In determining the propriety of a summary judgment, the trial court is limited to facts shown by the evidentiary materials submitted . . . . [Citations.] The court must consider all evidence set forth in the parties' papers, and summary judgment is to be granted if all the papers submitted show there is no triable issue of material fact in the action,

thereby entitling the moving party to judgment as a matter of law. [Citation.]" (*Committee to Save the Beverly Highlands Homes Assn. v. Beverly Highlands Homes Assn.* (2001) 92 Cal.App.4th 1247, 1261 [112 Cal.Rptr.2d 732].) " 'Whether property is in a dangerous condition often presents a question of fact, but summary judgment is appropriate if the trial or appellate court, viewing the evidence most favorably to the plaintiff, determines that no reasonable person would conclude the condition created a substantial risk of injury when such property is used with due care in a manner which is reasonably foreseeable that it would be used. [Citation . . . .]' [Citation.]" (*Sambrano v. City of San Diego* (2001) 94 Cal.App.4th 225, 234 [114 Cal.Rptr.2d 151].)

On appeal, "our review is de novo, and we independently review the record before the trial court." (*Riverside County Community Facilities Dist. v. Bainbridge 17* (1999) 77 Cal.App.4th 644, 652 [92 Cal.Rptr.2d 29].) "The trial court's stated reasons for granting summary judgment are not binding on us because we review its ruling, not its rationale." (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878 [116 Cal.Rptr.2d 158].)

B. *General Overview*

██ A governmental entity is liable for an injury caused by its property if at the time of the injury: (1) the property was in a dangerous condition; (2) the injury was proximately caused by the dangerous condition; (3) the dangerous condition created a reasonably foreseeable risk of the kind of injury that was incurred; and (4) the dangerous condition was negligently or wrongfully created by an employee of the entity, or the entity had actual and/or constructive knowledge of the dangerous condition a sufficient time ahead of the injury so as to take measures to protect against the dangerous condition. (§ 835.)

For the property to be considered in a "dangerous condition," it must create "a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property . . . is used with due care in a manner in which it is reasonably foreseeable that it will be used." (§ 830, subd. (a).) A public entity's "property may be considered dangerous if a condition on the adjacent property exposes those using the public property to a substantial risk of injury." (Cal. Law Revision Com. com., 32 West's Ann. Gov. Code (1995 ed.) foll. § 830, p. 299.)

A "design immunity" defense is provided under section 830.6. Under this statute, a public entity is not liable for a dangerous condition of its property if the public entity demonstrates that the injury was caused by property constructed in accordance with an approved plan or design. For the design

immunity to apply, there must exist: (1) a causal relationship between the plan and the accident; (2) discretionary approval of the plan prior to construction; and (3) substantial evidence supporting the reasonableness of the plan. (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 66 [109 Cal.Rptr.2d 1, 26 P.3d 332] (*Cornette*).)

Initially, we consider whether the alleged dangerousness of the luminaire's location, raised for the first time in opposition to defendant's motion for summary judgment, can be considered as a basis for denying the summary judgment motion. As discussed below, we conclude that it cannot.

## C. *The Plaintiff Cannot Raise the Alleged Dangerousness of the Luminaire for the First Time in Opposition to the Motion for Summary Judgment*

The City argues that because plaintiff made no allegations in her complaint that the physical location of the luminaire was a basis for dangerous condition liability, we cannot consider the issue in determining the propriety of the trial court's grant of summary judgment. In her reply brief, plaintiff argues that the placement of the luminaire, while not specifically referenced, is "closely tied to the City's dangerous condition liability which was clearly alleged in plaintiff's complaint." She further submits that the complaint is only one of the "pleadings" that define the issues to be addressed at the motion for summary judgment.

Plaintiff's first amended complaint alleges: "Plaintiff was a passenger in a vehicle northbound on Ridgecrest Road driven by James Dimeo, Jr., in the vicinity of its intersection with Pebble Beach Road in Victorville, unincorporated County of San Bernardino. Another vehicle driven by Dorothy Jean Specter was westbound on Pebble Beach Road stopped at a stop sign before attempting a left turn to go south on Ridgecrest Road. There was inadequate sight distance so that Specter did not perceive the approaching Dimeo vehicle which struck the Specter vehicle. Based upon information and belief, the [City] is responsible for the design, construction, maintenance and conrol [*sic*] of the southbound lanes of Ridgecrest Road. Based upon information and belief, [County] is responsible for the northbound lanes of Ridgecrest Road. Defendants [City] and [County] were negligent in designing, constructing, maintaining, controlling and otherwise creating and failing to correct dangerous road conditions due to inadequate sight distance and lack of warning signs, devices and signals. The dangerous conditions created an unreasonable risk of injury to persons using the roads and such dangerous conditions were a foreseeable cause of Plaintiff's injuries." There is no specific mention of the luminaire or any similar object. The "dangerousness"

of the luminaire was first specifically referenced in plaintiff's opposition to the City's motion for summary judgment. There, in response to defendant's separate statement of undisputed facts, plaintiff set forth additional undisputed facts, which included, "[t]he City created another dangerous condition by the installation of light fixtures too close to the roadway." The evidentiary support is the declaration of Howard Anderson. While defendant did not specifically object to this additional undisputed fact, it did assert, both in reply points and authorities and at oral argument on the motion, that the issue was not raised in plaintiff's pleadings.

"The pleadings delimit the issues to be considered on a motion for summary judgment. [Citation.]" (*Turner v. State of California* (1991) 232 Cal.App.3d 883, 891 [284 Cal.Rptr. 349] (*Turner*).) Thus, a "defendant moving for summary judgment need address only the issues raised by the complaint; the plaintiff cannot bring up new, unpleaded issues in his or her opposing papers." (*Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 98–99, fn. 4 [93 Cal.Rptr.2d 820].) "To create a triable issue of material fact, the opposition evidence must be directed to issues raised by the pleadings. [Citation.] If the opposing party's evidence would show some factual assertion, legal theory, defense or claim not yet pleaded, that party should seek leave to amend the pleadings before the hearing on the summary judgment motion. [Citations.]" (*Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1264–1265 [102 Cal.Rptr.2d 813].) "[T]he pleadings 'delimit the scope of the issues' to be determined and '[t]he complaint measures the materiality of the facts tendered in a defendant's challenge to the plaintiff's cause of action.' [Citation.] [Plaintiff's] separate statement of material facts is not a substitute for an amendment of the complaint. [Citation.]" (*Lackner v. North* (2006) 135 Cal.App.4th 1188, 1201–1202, fn. 5 [37 Cal.Rptr.3d 863] (*Lackner*).)

Here, plaintiff did not seek leave to amend her complaint prior to the hearing on the motion for summary judgment. The issue therefore presented is whether her amended complaint can be construed to encompass the issue of the dangerous placement or location of the luminaire.

In *Lackner*, the plaintiff received personal injuries when skiing at Mammoth Mountain. At the time of the injury, she was standing in a deserted area at the base of an advanced ski run. Cassidy North, a high school snowboarder, was training for the California Nevada Ski and Snowboard Federation State High School Championships. He sped down the run at a high rate of speed and struck the plaintiff. The plaintiff sued Mammoth, among others. She alleged that Mammoth had increased the risk of injury inherent in skiing by failing to enforce and supervise the race participants' use of ordinary ski runs and by failing to warn its patrons that race participants were permitted to

train on ordinary ski runs. Specifically, she alleged "that Mammoth negligently operated, maintained, and controlled the slopes so as to create a dangerous condition. It did so by permitting race participants to practice on runs not designated for training or racing, failing to warn its other patrons that participants were authorized to train on ordinary runs, and failing to take other precautions for the safety of persons using the slope." (*Lackner, supra,* 135 Cal.App.4th at p. 1202.) In opposition to Mammoth's motion for summary judgment, the plaintiff filed a supplemental statement of undisputed facts contending that Mammoth failed to post warning signs in the area of the collision where it generally posted such signs. On appeal the plaintiff argued for the first time that Mammoth should have posted signs warning individuals to slow down as they approached the flat area. With little discussion, the appellate court refused to consider the issue. A statement of undisputed facts, the court stated, "is not a substitute for an amendment of the complaint. [Citation.] Because [the plaintiff's] complaint fails to allege facts that give rise to a duty to post such signs, she may not assert Mammoth's breach of that duty." (*Id.* at pp. 1201–1202, fn. 5.)

In *Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621 [32 Cal.Rptr.3d 266] (*Oakland Raiders*), the plaintiff sued the National Football League on various theories, including breach of fiduciary duty. In response to the defendant's motion for summary adjudication, the plaintiff submitted three new or additional arguments as to how the defendant breached its fiduciary duty.[4] Although the merits of the three additional arguments were considered by both the trial and appellate courts, the appellate court stated, "the pleadings set the boundaries of the issues to be resolved at summary judgment. [Citations.] A 'plaintiff cannot bring up new, unpleaded issues in his or her opposing papers. [Citation.]' [Citations.] A summary judgment or summary adjudication motion that is otherwise sufficient 'cannot be successfully resisted by counterdeclarations which create immaterial factual conflicts outside the scope of the pleadings; counterdeclarations are no substitute for amended pleadings.' [Citation.] Thus, a plaintiff wishing 'to rely upon unpleaded theories to defeat summary judgment' must move to amend the complaint before the hearing. [Citations.]" (131 Cal.App.4th at p. 648.)

---

[4] According to the Court of Appeal, "[T]he Raiders' Additional Claims were derivative rather than direct claims. As such, they could not have been alleged as part of the Raiders' *individual* cause of action for breach of fiduciary duty contained in the second cause of action. The assertion of these *derivative* Additional Claims as *individual* claims would have been an attempt to allege an entirely different cause of action." (*Oakland Raiders, supra,* 131 Cal.App.4th at p. 649, fn. 26.)

In the context of governmental entity liability, numerous courts have addressed situations where the complaint adds factual allegations that arguably are not encompassed by the plaintiff's government tort claim. Although the procedural setting is different, such cases are analogous and instructive here.[5]

In *Fall River Joint Unified School Dist. v. Superior Court* (1988) 206 Cal.App.3d 431 [253 Cal.Rptr. 587] (*Fall River*), the plaintiff was a student at Fall River Junior-Senior High School. He received injuries when a steel door of a building struck his head. In his governmental claim he asserted that the door was "in a dangerous and defective condition" for several reasons, one of which was that it closed with excessive force. After the filing of the original complaint, the plaintiff filed an amended complaint alleging that school district personnel negligently failed to supervise students who were engaged in horseplay, and that he was injured as a result. The defendant moved for judgment on the pleadings based on the proposition that the cause of action for negligent supervision was not contained within the claim. The trial court denied the motion. The appellate court reversed. In doing so, the court stated that the "cause of action patently attempts to premise liability on an entirely different factual basis than what was set forth in the tort claim." (*Id.* at p. 435.)

In *Donohue v. State of California* (1986) 178 Cal.App.3d 795 [224 Cal.Rptr. 57] (*Donohue*), the plaintiff alleged in his claim that the State of California was negligent in allowing an uninsured motorist to take the driving test. In his complaint, he contended that the state was negligent by failing to instruct, direct, and control the driver in operating the vehicle. In affirming the trial court's grant of the motion for judgment on the pleadings, the court stated, "[t]he act of permitting an uninsured motorist to take a driving test is not the factual equivalent of the failure to control or direct the motorist in the course of his examination." (*Id.* at p. 804.)

In *Blair v. Superior Court* (1990) 218 Cal.App.3d 221 [267 Cal.Rptr. 13] (*Blair*), the plaintiff was a passenger in a vehicle that struck a tree after leaving the roadway. In his claim, the plaintiff contended that the car went out of control because of ice on the roadway and that the state negligently maintained and constructed the highway. The plaintiff's claim further indicated that the state failed to sand and care for the highway. In his complaint,

---

[5] "The primary function of the [Governmental Tort Claims Act] is to apprise the governmental body of imminent legal action so that it may investigate and evaluate the claim . . . ." (*Elias v. San Bernardino County Flood Control Dist.* (1977) 68 Cal.App.3d 70, 74 [135 Cal.Rptr. 621].) So too, "[t]he complaint in a civil action serves . . . to frame and limit the issues . . . and to apprise the defendant of the basis upon which the plaintiff is seeking recovery . . . ." (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211–212 [197 Cal.Rptr. 783, 673 P.2d 660], citations omitted.)

the plaintiff added to the allegations by pleading, " '5. . . . in addition, at that point, the roadway crosses a stream over a culvert or bridge requiring guard rails where there was no guard rail; in addition, the slope of the road is such that a vehicle striking ice is carried off the road causing it to strike adjacent roadside barriers including large trees that have been left close to the road also without a guard rail. [¶] 6. No warning signs were in place nor any other device designed to either advise the traveling public of danger or ameliorate that danger.' " (*Id.* at p. 224, italics omitted.) The trial court granted the defendant's motion to strike the added allegations. The appellate court reversed, indicating that it did not read the claim as narrowly as the defendant and that the law does not require the degree of specificity argued by the defendant. In distinguishing *Donohue, Fall River*, and three other cases, the court stated, "[i]t is apparent that in each of the decisions the plaintiff did not merely elaborate or add further detail to a claim which was predicated on the same fundamental facts set forth in the complaint. Rather, there was a complete shift in allegations, usually involving an effort to premise civil liability on acts or omissions committed at different times or by different persons than those described in the claim. In contrast, the claim and the complaint in this action are premised on essentially the same foundation, that because of its negligent construction or maintenance, the highway at the scene of the accident constituted a dangerous condition of public property." (*Blair, supra*, at p. 226.) The court when on to add, "[a] charge of negligent construction may reasonably be read to encompass defects in the placement of highway guard rails, slope of the road, presence of hazards adjacent to the roadway or inadequate warning signs." (*Ibid.*)

In *Turner*, the alleged discrepancy was not between the claim and the complaint, but rather between the claim and the facts submitted in opposition to the motion for summary judgment. There, the plaintiff was shot in the parking lot of Cal Expo in Sacramento. He alleged in his claim that the defendants knew or should have known that gang-related violence and shootings had occurred on the premises, and that the defendants "failed to provide adequate *warnings and/or security* to members of the general public . . . ." (*Turner, supra*, 232 Cal.App.3d at p. 889, fn. 2.) In their motion for summary judgment, the defendants argued that they were not liable on a theory of negligence or dangerous condition of public property based on their failure to provide adequate security. In response, the plaintiff submitted evidence of inadequate lighting in the area where the shooting occurred. The trial court granted summary judgment, concluding that the claim of inadequate lighting was barred because no such allegation was included in the claim. In affirming, the appellate court indicated, "Nowhere [in the claim] is there any mention of inadequate lighting as a basis for the dangerous condition of property . . . ." (*Id.* at p. 889.) The *Turner* court distinguished *Blair*, stating, "In . . . *Blair* the allegations in the claim were broad enough to

encompass those in the complaint. The allegations of the complaint merely clarified the allegations of the claim. Here, the allegations plaintiff seeks to introduce are completely different from those contained in the claim. Read in its entirety, the dangerous condition alleged in the claim is known criminal activity, not inadequate lighting. The new allegations constitute a complete shift in theory from what the defendants are alleged to have done to cause plaintiff's injuries." (*Turner, supra,* at pp. 890–891.)

While providing no bright line, these cases provide some guidance. Initially, if a plaintiff wishes to introduce issues not encompassed in the original pleadings, the plaintiff must seek leave to amend the complaint at or prior to the hearing on the motion for summary judgment.[6] Second, new factual issues presented in opposition to a motion for summary judgment should be considered if the controlling pleading, construed broadly, encompasses them. In making this determination, courts look to whether the new factual issues present different theories of recovery or rest on a fundamentally different factual basis.

For example, in *Lackner,* the plaintiff's initial theory was the defendant's alleged failure to control or supervise race participants and warn other patrons of the presence of race participants. In her complaint, the plaintiff attempted to add a subtly different theory—that the defendant failed to post warning signs telling downhill skiers to slow down because they were coming up on a flat portion of slope where other skiers often stopped. In *Oakland Raiders,* the plaintiff attempted to add entirely new factual bases to support a theory already alleged in the complaint. In *Fall River,* the plaintiff initially asserted a dangerous condition of public property based on alleged defects in the steel door. He later attempted to add not only new facts of children horseplaying, but also a new theory of negligent supervision. In *Turner,* the plaintiff initially pled theories of liability based upon the failure to provide adequate security, and later attempted to add an issue of a dangerous condition based on inadequate lighting.

In the present matter, plaintiff's supplemental statement of undisputed facts states: "The City created *another* dangerous condition by the installation of light fixtures too close to the roadway." (Italics added.) Unlike *Lackner* and *Fall River,* no new legal theory is alleged. Both the amended complaint and

---

[6] "A sufficient motion cannot be successfully resisted by counterdeclarations which create immaterial factual conflicts outside the scope of the pleadings; counterdeclarations are no substitute for amended pleadings." (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1065 [225 Cal.Rptr. 203].) " ' " 'If either party finds, on the hearing of [a summary judgment] motion, that his pleading is not adequate, . . . the court may and should permit him to amend; but in the absence of some request for amendment there is no occasion to inquire about possible issues not raised by the pleadings.' " ' " (*Kirby v. Albert D. Seeno Construction Co.* (1992) 11 Cal.App.4th 1059, 1069, fn. 7 [14 Cal.Rptr.2d 604].)

the supplemental undisputed fact are premised on the theory of dangerous condition of public property. Unlike *Blair*, the new fact adds a physical defect not the least bit encompassed within the amended complaint. In *Blair*, the original claim spoke of the plaintiff being in a car on a downgrade. The vehicle went out of control and collided with a tree. The claim additionally alleged that the defendants were negligent in failing to sand the roadway and, more broadly, in failing to maintain, construct, and care for the highway. Thus, in *Blair*, there were not only broad allegations relative to the construction and maintenance of the highway, but also factual references to the vehicle striking a tree. Implicit in this is that the car went off the roadway, the tree was in the vicinity of the traveling lanes, and a barrier or guardrail would have prevented the vehicle from leaving the traveling lanes and striking the tree. Thus the court could properly conclude that the claim and the complaint were "predicated on the same fundamental facts." (*Blair, supra,* 218 Cal.App.3d at p. 226.) Such cannot be said for the present case. Factually, the amended complaint speaks only of the intersection, the fact that Dimeo and Specter could not see each other, and that the Dimeo vehicle struck the Specter vehicle. And, as to the basis for liability it alleges, "[d]efendants [City] and [County] were negligent in designing, constructing, maintaining, controlling and otherwise creating and failing to correct dangerous road conditions *due to inadequate sight distance and lack of warning signs, devices and signals.*" (Italics added.) The pleading does not mention any facts involving the southbound lanes or, more importantly, the fact that the Dimeo vehicle struck a luminaire, pole, or some similar object. In the amended complaint, there is no explicit or implicit involvement of the luminaire. The additional fact shifts the alleged dangerous condition to a portion of public property not remotely referenced in the amended complaint. It attempts to predicate liability on a totally different condition, not the least bit involved with the intersection or inadequate sight distance.

The complaint limits the issues to be addressed at the motion for summary judgment. The rationale is clear: It is the allegations in the complaint to which the summary judgment motion must respond. (*Todd v. Dow* (1993) 19 Cal.App.4th 253, 258 [23 Cal.Rptr.2d 490].) Upon a motion for summary judgment, amendments to the pleadings are readily allowed. (*Kirby v. Albert D. Seeno Construction Co., supra,* 11 Cal.App.4th at p. 1069, fn. 7.) If a plaintiff wishes to expand the issues presented, it is incumbent on the plaintiff to seek leave to amend the complaint either prior to the hearing on the motion for summary judgment, or at the hearing itself. (*Ibid.*) To allow a party to expand its pleadings by way of opposition papers creates, as it would here, an unwieldy process.[7]

---

[7] To allow an issue that has not been pled to be raised in opposition to a motion for summary judgment in the absence of an amended pleading, allows nothing more than a moving target. For Code of Civil Procedure section 437c to have procedural viability, the

### D. *The City May Be Found Liable for the Alleged Dangerous Intersection*

In the trial court and on appeal, plaintiff asserted that triable issues of fact exist as to whether the intersection constituted a dangerous condition based upon the inadequacy of the stopping sight distance for northbound motorists. On appeal, the City does not dispute this contention. Instead, the City argues that it cannot be liable for the dangerousness of the intersection because the northbound lanes were owned, controlled, and maintained by the County, not the City. In support of its motion for summary judgment on this issue, the City submitted "undisputed" facts negating such ownership, control, and maintenance. In support thereof, the City submitted the declarations of engineers John McGlade and Edward Ruzak. McGlade declared that the County owned, maintained, controlled, and had responsibility for the northbound lanes; the City had control and responsibility for the southbound lanes; and the City did not construct, maintain, own, or control the northbound lanes. Ruzak indicated that the as-built plans delineate the northbound lanes as being County property and the southbound lanes as being owned and controlled by the City.

Plaintiff, in her response, did not dispute these facts, other than as they relate to the intersection as a whole. However, plaintiff argues that the City, as the owner of the southbound lanes, can be liable for an accident on the adjacent property because the addition of the southbound lanes increased the dangerousness of crossing through the intersection. Thus, the issue is whether the City's liability may be premised on Specter's attempt to use City property (i.e., the southbound lanes) in combination with the existence of a dangerous condition on the adjacent County property (i.e., the northbound lanes). As we explain, there are sufficient facts in the record to create a triable issue relative to the imposition of liability on the City even though the initial impact occurred on County property and the obstructions to visibility existed on the County side of Ridgecrest.

In *Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139 [132 Cal.Rptr.2d 341, 65 P.3d 807] (*Bonanno*), the plaintiff was struck by a vehicle while crossing a county-owned roadway to get to a bus stop established by the defendant (CCCTA). Following a plaintiff's verdict, CCCTA appealed. In affirming the judgment, the Court of Appeal held that

---

parties must be acting on a known or set stage. As stated in *Turner, supra*, 232 Cal.App.3d at page 891, footnote 3, "[p]laintiff contends any defect in the claim served on the State Board of Control is not a proper basis to disregard inadequate lighting evidence because defendants did not raise this in their initial memorandum in support of summary judgment. However, this merely underscores the lack of any lighting contention in both the claim and the complaint. Defendants had no reason to challenge such contention when they had no notice plaintiff was relying on it. The complaint circumscribes the claims and theories the defendants must meet on a motion for summary judgment. [Citation.]"

the location of the bus stop " 'beckoned pedestrian bus patrons to cross, and compelled cars to stop, at the feeder crosswalk without attendant traffic lights or pedestrian-activated signals.' " (*Id.* at p. 146.) The Supreme Court, in granting CCCTA's petition, limited review to the question of " 'whether the location of a bus stop may constitute a dangerous condition of public property under Government Code section 830 because bus patrons will be enticed to cross a dangerous crosswalk to reach the bus stop.' " (*Ibid.*) "Our order . . . assumes the existence of a dangerous crosswalk, posing only the question whether a *bus stop* may be deemed dangerous because bus users, to reach the stop, must cross at that dangerous crosswalk." (*Id.* at p. 147.)[8] In finding that the bus stop could be deemed dangerous and that CCCTA was liable for an injury occurring on adjacent property, the court relied heavily on the concept expressed in the California Law Revision Commission comments regarding section 830: " '[A public entity's] own property may be considered dangerous if it creates a substantial risk of injury to adjacent property or to persons on adjacent property; and its own property may be considered dangerous if a condition on the adjacent property exposes those using the public property to a substantial risk of injury.' " (*Bonanno, supra,* at p. 148, quoting Cal. Law Revision Com. com., 32 West's Ann. Gov. Code, *supra,* foll. § 830, p. 299.) Applying the comments to the facts before it, the court stated, " '[A] condition on the adjacent property [the crosswalk at an uncontrolled intersection] exposes those using the public property [the bus stop] to a substantial risk of injury.' " (*Bonanno, supra,* at p. 148, quoting Cal. Law Revision Com. com., 32 West's Ann. Gov. Code, *supra,* foll. § 830, p. 299.)

*Bonanno* was followed in *Joyce v. Simi Valley Unified School Dist.* (2003) 110 Cal.App.4th 292 [1 Cal.Rptr.3d 712] (*Joyce*). In *Joyce,* the plaintiff was

---

[8] While the court in *Bonanno* "assumed" the existence of a dangerous crosswalk, the evidence here demonstrates triable issues of material fact as to the adequacy of the stopping sight distance at the intersection for individuals using due care. It is clear from the evidence that the 280-foot vertical curve to the south of the intersection impedes the line of sight of motorists stopped at and approaching the intersection. Plaintiff's experts opined that, based on the northerly downslope of the westbound lane of Pebble Beach at the intersection, there was only 510 feet of stopping sight distance, and that 605 feet is called for by the design manual criteria. Additionally, according to plaintiff's experts, with a 55-mile-per-hour speed limit, a driver should have 7.5 seconds to view cross traffic; given a northbound vehicle traveling 55 to 60 miles per hour, there would be an insufficient amount of time for the westbound vehicle to view cross traffic and reasonably clear the intersection. (A speed survey performed by expert Howard Anderson demonstrated that the average speed of vehicles in the area of the accident was 56 miles per hour with the 85th percentile being 62 miles per hour.)

Plaintiff's evidence places directly into issue critical factual disputes as to the sight distance at the intersection, the prevailing speeds of northbound motorists approaching the intersection, and whether, given these facts, there is adequate stopping sight distance for motorists using due care as they proceed northbound on Ridgecrest or for motorists on Pebble Beach turning left across two lanes of northbound travel. A triable issue of fact exists as to whether the property created a foreseeable risk of injury to members of the motoring public "using due care."

walking to school, crossing a four-lane city roadway in a marked crosswalk. There was no signal at the crosswalk. The crosswalk led to an open school yard gate, which the plaintiff was attempting to access. While in the crosswalk she was struck by a vehicle. (*Id.* at p. 295.) At trial, the jury returned a plaintiff's verdict against the school district. The school district appealed. The appellate court, in affirming the judgment, relied on *Bonanno* and the California Law Revision Commission comment to section 830. Quoting *Bonanno*, the court stated, " '[n]or is it determinative that Bonanno's injury occurred on adjacent County property as she approached the bus stop, rather than while she was awaiting the bus at the stop itself. . . . [T]hat Bonanno was injured trying to access CCCTA's property makes her no less a user of it. If a CCCTA bus stop could be reached only by jumping across an adjacent ditch, CCCTA would logically bear the same liability to a patron who fell into the ditch attempting to reach the [bus] stop as to one who fell while waiting at the [bus] stop.' [Citation.]" (*Joyce, supra*, at p. 300.)

In both *Bonanno* and *Joyce,* the plaintiffs were injured while on property adjacent to the defendants' property. Both the plaintiffs were exposed to a risk of injury because they were attempting to use the defendants' property (the bus stop or school grounds). As here, plaintiff was injured while on adjacent property (the northbound lanes). She was exposed to a risk of injury because at the time of the accident Specter was attempting to use and access defendant's southbound lanes.[9]

In both *Bonanno* and *Joyce*, the defendant entity had some ability to protect against the injury. In *Bonanno*, the transit district could have moved the bus stop; in *Joyce*, the school district could have removed the opening in the fence. Here, the evidence of the City's ability to control, or protect against the risk of injury, is far less obvious; yet triable issues nonetheless remain. While there is no evidence in the record of any contract or agreement

[9] In *Bonanno*, it was the plaintiff who was attempting to use the transit district's bus stop. Here, plaintiff was not attempting to use the City's southbound lanes; she was a passenger in Dimeo's car. It was Specter who was attempting to use the southbound lanes. We do not believe this to be a legally meaningful distinction. In *Bonanno*, one driver, Jeremy McLain, was driving eastbound on the county road. (*Bonanno, supra*, 30 Cal.4th at p. 145.) He was following a car driven by Jennifer Kimberly. Bonanno stepped from the curb and began to cross the street in the crosswalk. Kimberly either stopped or was slowing when McLain's vehicle rear-ended Kimberly, moving Kimberly's vehicle into Bonanno. (*Ibid.*) If Kimberly, rather than Bonanno, had sued the transit district, the result should, legally, be no different because *the nexus between the bus stop and the injury is no less direct.* It is the attempted "use" of the bus stop (regardless of by whom) and its relationship with the adjacent property which creates the risk of injury. As here, it was Specter's attempt to access the southbound lanes, together with the inadequate stopping sight distance for northbound vehicles, that created the risk of injury. As stated in *Bonanno*, "[t]hat the location of a public improvement or, more broadly, its relationship to its surroundings, may create dangers to users is by no means a novel idea." (*Id.* at p. 149.)

between the City and the County relative to the intersection, there is evidence that in 1996 Ridgecrest was widened. At that time, the plans and designs were reviewed and approved by Jon Roberts, the City's traffic engineer. The County also approved the street improvement plans. Robert Crommelin, one of plaintiff's experts, declared that at the time of the addition of the southbound lanes, there should have been a reduction in the vertical curve just south of the intersection of Ridgecrest and Pebble Beach. At the time of this widening, both the City and the County had the ability to effect change in the design of the roadway, so as to protect against the inadequate stopping sight distance at the intersection. More to the point, there is evidence that the City in 1998 and 2002 conducted an all-way stop and traffic signal warrant analysis for the "intersection of Ridgecrest Road and Pebble Beach Drive (High Crest)." From this evidence it would appear that triable issues exist as to the City's ability and opportunity to protect against the risk of injury immediately prior to the accident. (See *Warden v. City of Los Angeles* (1975) 13 Cal.3d 297, 300 [118 Cal.Rptr. 487, 530 P.2d 175]; *Shea v. City of San Bernardino* (1936) 7 Cal.2d 688, 692–693 [62 P.2d 365].)

Thus, liability may be imposed on the City for an alleged dangerous intersection even though the initial impact occurred on County property and the obstructions to visibility existed on the County side of Ridgecrest.

E. *The Evidence Established the Applicability of the Design Immunity As a Matter of Law*

██ Under section 830.6, a public entity may avoid liability for a dangerous condition of property if it can establish that the injury was caused by an approved plan or design. To establish the immunity, the entity must establish: " ' "(1) [a] causal relationship between the plan and the accident; (2) discretionary approval of the plan prior to construction; [and] (3) substantial evidence supporting the reasonableness of the design." ' [Citations.]" (*Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 939 [67 Cal.Rptr.2d 454].)

"The rationale for design immunity is to prevent a jury from second-guessing the decision of a public entity by reviewing the identical questions of risk that had previously been considered by the government officers who adopted or approved the plan or design. [Citation.] ' " '[T]o permit reexamination in tort litigation of particular discretionary decisions where reasonable men may differ as to how the discretion should be exercised would create too great a danger of impolitic interference with the freedom of decision-making by those public officials in whom the function of making such decisions has been vested.' " [Citation.]' [Citation.]" (*Cornette, supra*, 26 Cal.4th at p. 69.)

In 1996, the City prepared plans relative to the widening of Ridgecrest and the continuation of Pebble Beach west of Ridgecrest. (The continuation street is named Highcrest.) The plans were approved by Jon Roberts. Thirteen days later, they were approved by an engineer for the County. The plans do not depict the block wall to the east of Ridgecrest. They do, however, show the vertical curvature of Ridgecrest south of its intersection with Pebble Beach for not only the portion of roadway to be added but also for the already existing lanes.

As to the causal relationship between the plans and the accident, there is a clear nexus between the vertical curvature of Ridgecrest south of its intersection with Pebble Beach as shown in the plans and the adequacy or inadequacy of stopping sight distance. Thus the first prong is met.[10]

As to the second prong, the discretionary approval of the plans prior to construction, the 1996 plans depict the vertical curve on Ridgecrest just south of the intersection with Pebble Beach and the widening of the road. In his declaration, John McGlade, a City engineer, declared that these plans were reviewed and approved by Jon Roberts, an engineer employed by the City. Ruzak also declared that the plans were approved by Roberts and the San Bernardino County Road Department in April 1996. The plans themselves show that they were signed and approved by Roberts in his capacity as the City Engineer. As such, his signature is presumed genuine. (See Evid. Code, § 1453.) Such evidence satisfies the City's evidentiary burden for the second prong. (See *Alvarez v. State of California* (1999) 79 Cal.App.4th 720, 734 [95 Cal.Rptr.2d 719], disapproved on another point in *Cornette, supra*, 26 Cal.4th at pp. 73–74.) Whether the engineers in approving the 1996 plans took into consideration the added distance and involved time for a westbound motorist to clear the northbound lanes, as opposed to clearing only one northbound lane as represented by the 1969 plans, is not for us to speculate in a record void of any evidence relative thereto. (See *Alvarez v. State of California, supra*, at p. 734.)

Relative to the third element of design immunity, the City must "present substantial evidence of the reasonableness of the approved design. [Citation.]" (*Higgins v. State of California* (1997) 54 Cal.App.4th 177, 186 [62 Cal.Rptr.2d 459] (*Higgins*), disapproved on another point in *Cornette, supra*, 26 Cal.4th at pp. 73–74.) "[T]he third element of design immunity, the existence of substantial evidence supporting the reasonableness of the adoption of the plan or design, [is] a matter for the court, not the jury. '[T]he trial

---

[10] In addition to the inadequate stopping sight distance caused by the vertical curvature of Ridgecrest, plaintiff asserts that the height of the block wall adjacent to Ridgecrest obstructed the line of sight from the intersection. However, there is no evidence that the block wall, not shown on the 1996 plans, had any causal relationship to the accident.

or appellate court' is to determine whether 'there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan . . . or (b) a reasonable . . . employee could have approved the plan or design or the standards therefor.' (§ 830.6.)" (*Cornette, supra,* at p. 72.) "In determining whether evidence . . . is substantial, the question is whether the evidence 'reasonably inspires confidence' and is of 'solid value.' [Citation.]" (*Muffett v. Royster* (1983) 147 Cal.App.3d 289, 307 [195 Cal.Rptr. 73], disapproved on another point in *Cornette, supra,* at pp. 73–74.) Typically, "any substantial evidence" consists of an expert opinion as to the reasonableness of the design, or evidence of relevant design standards. (See *Fuller v. Department of Transportation* (2001) 89 Cal.App.4th 1109, 1118 [107 Cal.Rptr.2d 823]; *Weinstein v. Department of Transportation* (2006) 139 Cal.App.4th 52, 59 [42 Cal.Rptr.3d 417].)

Relative to this issue, the City submitted one "undisputed" fact: "The westside (southbound lanes) street improvements and widening of Ridgecrest Road included modification of the intersection of Highcrest and Ridgecrest Road. The road and intersection modification and improvements were reviewed and approved in accordance with good engineering practices by Jon Roberts, professional engineer, employed by the [City], on April 16, 1996. The County approved the plans on April 29, 1996." In support of this fact, the City provided the declarations of Ed Ruzak, a registered civil and traffic engineer, and John McGlade, a civil engineer employed by the City. Ruzak declared that he reviewed the as-built plans. His declaration thereafter addresses only the southbound lanes and their interface with Highcrest. There is nothing in his declaration to support the fact that the plans and design for the intersection of Ridgecrest and Pebble Beach and the northbound lanes south of the intersection were reasonably approved.

McGlade's declaration was also focused on the southbound lanes. His declaration is two and one-half pages in length. Approximately one page is dedicated to the issue that the County owned, controlled, and maintained the northbound lanes and the City owned, controlled and maintained the southbound lanes. Within this context, he declares that "[t]he [City] did not design the northbound lanes of Ridgecrest . . . ." He further states that "[t]he sight line looking south onto Ridgecrest Road from Pebble Beach Drive for oncoming northbound traffic is on County owned, maintained and controlled property." Lastly, he declares that in 1996 Ridgecrest was widened to the west. And that "[t]he west side (southbound lanes) street improvements and widening of Ridgecrest Road included modification of the intersection of High Crest and Ridgecrest Road . . . . The road and intersection modification and improvements were reviewed and approved in accordance with good engineering practices by Jon Roberts, a professional engineer

employed by the [City] on April 16, 1996. [¶] . . . The [County] reviewed the street improvement plan for Ridgecrest Road . . . and approved the plan on 04/29/1996."

In deciding whether there is substantial evidence to support the notion that the plan or design was reasonably approved, we must determine whether there is evidence that "reasonably inspires confidence" and is of "solid value." No portion of Ruzak's declaration supports the conclusion that the plans and designs of the northbound lanes and their intersection with Pebble Beach were reasonably approved. Equally, we do not believe that McGlade's declaration is supportive of the reasonableness of the design and approval. While one portion of the declaration could arguably be viewed in isolation as supporting the reasonableness of the plan and design for the entire roadway, when viewed in the context of the entire declaration, the essence of McGlade's declaration is that the plans and design for the *southbound lanes* fell within the range of reasonable engineering guidelines; not that the design of the overall intersection and approaching northbound lanes was designed to comply with reasonable engineering principles. And, as to the portion of the declaration which could arguably be relied upon by the City to support the reasonableness of the design, McGlade limits his opinion to the "road and intersection modification and improvements" of Ridgecrest *and Highcrest.* Based on the papers it submitted we do not believe that defendant met its initial burden of production as it relates to the third prong of the design immunity.[11]

To cure the evidentiary omission in the City's papers, the City has requested that we take judicial notice of specified "court records" filed by the County in the superior court in this case in connection with the County's motion for summary judgment. The City also requests judicial notice of our prior unpublished opinion affirming the grant of summary judgment in favor

---

[11] In *Higgins, supra,* 54 Cal.App.4th 177, the court stated, "[t]he fact of approval by competent professionals can, in and of itself, establish the reasonableness element. [Citation.]" (*Id.* at p. 187, disapproved on another point in *Cornette, supra,* 26 Cal.4th at pp. 73–74.) Present in *Higgins,* however, was a declaration by a civil engineer with a certificate in traffic engineering, which "averred the subject median area, as designed and built, was 'in conformance with design standard for medians.' Because it was more than 46 feet wide, 'it did not have, nor should it have had, a median barrier.' Finally, in [the civil engineer's] expert opinion, both the original design plans and the plans for the modifications, including the installation of carpool lanes, 'could reasonably have been approved.'" (*Higgins, supra,* at p. 182.) The *Higgins* court relied on *Ramirez v. City of Redondo Beach* (1987) 192 Cal.App.3d 515 [237 Cal.Rptr. 505]. In *Ramirez,* "an expert witness . . . testified that in his opinion the design of the median break was not dangerous, but in fact fostered safety . . . . [¶] . . . [¶] . . . Although the evidence presented to the court was conflicting, there was substantial evidence supporting the view that the design of the median was reasonable. As previously noted, the City's expert witness *did* find that the plan for the median strip was *not* dangerous." (*Ramirez v. City of Redondo Beach, supra,* at pp. 525–526.)

of the County. Plaintiff does not oppose the request. We grant the request pursuant to Evidence Code sections 452, subdivision (d), and 459, subdivision (a).[12] However, this does not help the City. First, while we take judicial notice of the *existence* of the documents in court files, we do not take judicial notice of the truth of the facts asserted in such documents. (See *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564–1565 [8 Cal.Rptr.2d 552].) Thus, even if there are facts asserted within the records specified by the City that might cure the evidentiary gap in its motion, the City cannot rely upon them to satisfy its burden of production in this case.

The context within which the trial court and this court are dealing with the issue of the design immunity is that of a summary judgment motion. Our sole function "is to determine *from the submitted evidence* whether there is a 'triable issue as to any material fact' . . . ." (*Zavala v. Arce* (1997) 58 Cal.App.4th 915, 926 [68 Cal.Rptr.2d 571], citation omitted, italics added.) Our decision in the companion County case stands solely for the proposition that, "from the evidence submitted," there was no triable issue of fact as to the applicability of the design immunity. Such a finding in the County motion has no bearing on the City's separate motion, where the supporting evidence relied on is distinct from that proffered in connection with the County's motion.

Additionally, to the extent the City seeks to rely upon facts in these records, the evidence of such facts is not referenced in the City's separate statement of undisputed facts, as required by Code of Civil Procedure section 437c, subdivision (b)(1) (each material fact in the separate statement "shall be followed by a reference to the supporting evidence"). " 'The due process aspect of the separate statement requirement is self evident—to inform the opposing party of the evidence to be disputed to defeat the motion.' [Citation.] [¶] . . . [T]he evidence . . . was omitted from the separate statement . . . . In considering this evidence, the court violated [plaintiff's] due process rights. . . . Where a remedy as drastic as summary judgment is involved, due process requires a party be fully advised of the issues to be addressed and be given adequate notice of what facts it must rebut in order to prevail. [Citation.]" (*San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316 [125 Cal.Rptr.2d 499].) Here, the evidence submitted by the County was not included as part of the supporting evidence on the City's motion. And as provided by Code of Civil Procedure section 437c, subdivision (b)(7), "[a]ny incorporation by reference of matter in the court's file shall set forth with specificity the exact matter to which reference is being

---

[12] Evidence Code section 452, subdivision (d) provides that judicial notice may be taken of records of "any court of this state." Evidence Code section 459, subdivision (a) permits a reviewing court to take judicial notice of any matter specified in Evidence Code section 452.

made . . . ." This was not done here. Neither the trial court nor the appellate court can properly consider the County's evidence in considering the City's motion.

■ With this said, we believe the trial court's grant of summary judgment was nonetheless appropriate. As earlier discussed, the missing link in defendant's evidence was the third element of the design immunity—"substantial evidence of the reasonableness of the approved design. [Citation.]" (*Higgins, supra,* 54 Cal.App.4th at p. 186.) Typically, "any substantial evidence" consists of an expert opinion as to the reasonableness of the design, or evidence of relevant design standards. (See *Fuller v. Department of Transportation, supra,* 89 Cal.App.4th at p. 1118; *Weinstein v. Department of Transportation, supra,* 139 Cal.App.4th at p. 59.) In opposition to the City's motion, plaintiff submitted and attached as an exhibit the declaration of David Royer. The original of this declaration was submitted by the County, in support of its motion. In his declaration, Royer opined: "In my expert opinion as a professional Civil and Traffic Engineer, registered as such by the State of California, the design of the roadway at the subject location is not only reasonable but is an excellent design. There was no defect in the design or operation of the roadway at the time of the accident herein. . . ." Implicit in this statement is that the design was reasonably approved.[13]

As set forth in Code of Civil Procedure section 437c, subdivision (c), "The motion for summary judgment shall be granted if *all the papers submitted* show that there is no triable issue as to any material fact . . . . In determining whether the papers show that there is no triable issue as to any material fact *the court shall consider all of the evidence set forth in the papers . . . ."* (Italics added.) "All of the evidence" includes evidence supplied by the plaintiff that supports the defendant's motion. In *Villa v. McFerren* (1995) 35 Cal.App.4th 733 [41 Cal.Rptr.2d 719], for example, the court considered deposition testimony supplied by a plaintiff in determining whether the defendant's burden of production had been met. The court stated, "We reject the argument that the trial court could not consider the deposition transcript excerpts produced by plaintiff in determining whether the burden of proof had shifted. No doubt, had plaintiff not produced the transcript of defendant's deposition, the burden would never have shifted and the summary judgment motion should have been denied. However, in determining whether the burden of proof has shifted, the trial court . . . must consider all of the papers

---

[13] The declaration also cited to nine prior accidents at the intersection. Royer's declaration further alluded to a traffic study jointly conducted by the County and the City prior to the accident in question. Lastly, the declaration referenced sight-line visibility requirements for roadways designed in 2002 indicating that 600 feet of stopping sight distance is required for cars traveling 62 miles per hour. (As referenced in fn. 8, *ante,* at the time of the present accident there was 510 feet of stopping sight distance.)

before it." (*Id.* at pp. 750–751.) Because of this, we find that the present record demonstrates no triable issue of fact as it relates to the applicability of the design immunity.[14]

F. *There Is No Triable Issue of Fact That the County Lost the Design Immunity As a Result of "Changed Circumstances"*

■ "[A]fter a defendant has shown the applicability of the design immunity to the plaintiff's claims, the plaintiff bears the burden of establishing each of the three elements of the loss of the immunity. [Citation.] . . . Consistent with their burden at trial of establishing the elements of [defendant's] loss of the design immunity, plaintiffs bore the burden of production in opposition to the motion for summary judgment 'to make a prima facie showing of the existence of a triable issue of material fact' [citation] with respect to the loss of the design immunity. Since it is necessary to establish all three elements of the loss of the design immunity [citation], plaintiffs needed to make a prima facie showing of the existence of a triable issue of fact with respect to each of those elements to overcome [defendant's] motion for summary judgment." (*Mirzada v. Department of Transportation* (2003) 111 Cal.App.4th 802, 806–807 [4 Cal.Rptr.3d 205].) The elements that must be addressed by plaintiff are: "(1) the plan or design has become dangerous because of a change in physical conditions; (2) the public entity had actual or constructive notice of the dangerous condition thus created; and (3) the public entity had a reasonable time to obtain the funds and carry out the necessary remedial work to bring the property back into conformity with a reasonable design or plan, or the public entity, unable to remedy the condition due to practical impossibility or lack of funds, had not reasonably attempted to provide adequate warnings." (*Cornette, supra*, 26 Cal.4th at p. 66.)

In addressing the first element that the plan or design has become dangerous because of a change in physical conditions, the court in *Weinstein v. Department of Transportation, supra*, 139 Cal.App.4th 52, indicated, in addressing a cross-median accident and the absence of a median barrier in a Caltrans (Department of Transportation) plan, that "[p]laintiffs did not meet this burden. Their showing relied on the increase in traffic at the accident location and a corresponding increase in accidents. However, plaintiffs failed to produce evidence that either statistic made the condition of the roadway at the accident location inconsistent with state standards or would have rendered it unreasonable for a public entity to approve the design of the roadway. . . . Plaintiffs produced no evidence that increased traffic volume alone mandated a median barrier under the applicable state standards, *and they otherwise*

---

[14] Use of evidence produced by plaintiff does not implicate her due process rights relative to notice of the facts upon which the motion is based, in that it is plaintiff who proffered the evidence.

*failed to support their claim of loss of design immunity with evidence that changed conditions had caused the accident location to become dangerous."* (*Id.* at pp. 60–61, italics added.) Here, as in *Weinstein*, plaintiff has failed to meet the element of "changed conditions."

The record contains no traffic counts and little traffic accident history. There is absolutely nothing upon which a court could find a triable issue. The original design of Ridgecrest and Pebble Beach occurred in 1969. The design was subsequently modified in 1996 to widen the intersection. Plaintiff provides no statistical data on the increase of traffic flow at the intersection between 1969 and 1996, and 1996 to the date of the accident. No speed surveys over the relevant time period are provided and there is no attempted correlation between increased traffic flow, increased speeds, and increased accidents. There is nothing in the record to support even an inference that the functioning of the intersection was any different in 1969, 1996, or 2002. Plaintiff has simply failed to address, from an evidentiary point of view, the issue of changed conditions.

Lastly, plaintiff failed to proffer sufficient evidence that the City had time to obtain funds to carry out remedial work to bring the property into conformity with a reasonable design or that they did not reasonably attempt to provide adequate warnings, or otherwise restrict turning movements onto the southbound lanes. Neither of plaintiff's experts addressed the issue of providing warning signs or speed signs, as designated in the traffic manual. The only evidence of suggested remedial work provided by plaintiff was Crommelin's declaration that a signal light could have been installed or the elevation of Ridgecrest could have been reduced by "about one (1) foot." There is no evidence that defendant had a reasonable time to obtain the funds and carry out the suggested remedial work.

### G. *The City's Cross-appeal*

The City appealed the denial of its motion for defense costs and expenses. We affirm.

#### 1. *Procedural Background*

Following the grant of summary judgment and prior to the entry of judgment, the City filed a motion for attorney fees, expert fees, and costs pursuant to Code of Civil Procedure section 1038. Alternatively, the City moved for the recovery of its expenses, including attorney fees, pursuant to Code of Civil Procedure section 2033.420.

The City's motion was heard on October 17, 2005. Following argument, additional briefing was permitted and the matter submitted.

On December 14, 2005, the court issued a minute order denying the motion "without prejudice subject to the outcome of the appeal."

The City then filed a motion for renewal of defendant's motion for attorney fees and costs, requesting reconsideration of the December 14, 2005, ruling.[15] On January 30, 2006, the court granted this motion and took the matter of the motion for fees under submission. On February 10, 2006, the court issued a minute order denying the City's motion for attorney fees with prejudice.[16]

### 2. *Motion for Defense Costs Under Code of Civil Procedure Section 1038*

██ Code of Civil Procedure section 1038, subdivision (a), provides, in relevant part: "In any civil proceeding under the California Tort Claims Act . . . , the court, upon motion of the defendant . . . , shall . . . determine whether or not the plaintiff . . . brought the proceeding with reasonable cause and in the good faith belief that there was a justifiable controversy under the facts and law which warranted the filing of the complaint . . . . If the court should determine that the proceeding was not brought in good faith and with reasonable cause, an additional issue shall be decided as to the defense costs reasonably and necessarily incurred by the party or parties opposing the proceeding, and the court shall render judgment in favor of that party in the amount of all reasonable and necessary defense costs, in addition to those costs normally awarded to the prevailing party." The statute "provides public entities . . . with a way to recover the costs of defending against unmeritorious and frivolous litigation." (*Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 857 [80 Cal.Rptr.2d 803, 968 P.2d 514] (*Kobzoff*).)

### (a) *Timeliness of the Motion for Attorney Fees*

We first consider an argument by plaintiff that the City's motion was untimely. Code of Civil Procedure section 1038, subdivision (c), provides that a motion for fees made pursuant to that section be made prior to the

---

[15] According to the City, the court's December 14, 2005, ruling suggested that the motion could be brought following the appeal. However, the City explained that, under the governing statutes, the appeal could not be filed until judgment is entered, and the judgment could not be entered until the attorney fees motion was resolved. The attorney fees motion must therefore be decided before the appeal.

[16] The court's February 10, 2006, minute order states that the City's "Motion for RENEWAL OF CITY'S MOTION FOR ATTORNEYS' FEES is Denied." By referring to the motion for renewal, the minute order appears to conflict with its January 30, 2006, ruling. The City, however, interprets this order as denying the motion for attorney fees itself, and plaintiff does not disagree. We will treat it as such.

discharge of the jury or entry of judgment. The City filed its motion on August 15, 2005. Judgment was entered on June 8, 2006. The motion was therefore timely.

Plaintiff argues that, "according to the trial court's register of actions, it entered judgment for the City on May 4, 2005," and refers us to the court's order granting the City's motion for summary judgment. As the City correctly points out, the May 4, 2005, order is merely the order granting its motion for summary judgment, not the judgment itself. Plaintiff's argument is without merit.

(b)  *Implied Findings*

In order to deny a motion for fees under Code of Civil Procedure section 1038, the court must find the plaintiff brought or maintained the action: (1) in the good faith belief in the action's justifiability, and (2) with objective reasonable cause. (*Kobzoff, supra*, 19 Cal.4th at p. 862; *Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 888 [57 Cal.Rptr.3d 454].) The City contends that the trial court "abdicated its duty under this statute in refusing to make a ruling on the merits of the City's motion." It argues that the trial court was required "to make a determination of whether [p]laintiff's action was brought or maintained ***both*** in the good faith belief in the action's justifiability ***and*** with objective reasonable cause." Indeed, the statute states that the court "*shall . . . determine*" whether the plaintiff brought the proceeding with reasonable cause in good faith. (Code Civ. Proc., § 1038, subd. (a), italics added.) The City, however, simply assumes that the court did not make the necessary factual determinations. As a reviewing court, we cannot make the same assumption. Indeed, we must presume that it did so.

It is a fundamental principle of appellate review that we presume that a judgment or order is correct. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [57 Cal.Rptr.3d 363]; see generally 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 349, pp. 394–395.) Moreover, it is the appellant's burden of providing a record that establishes error, and where the record is silent, we must indulge all intendments and presumptions to support the challenged ruling. (*Forrest v. Department of Corporations* (2007) 150 Cal.App.4th 183, 194 [58 Cal.Rptr.3d 466]; *Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 58 [58 Cal.Rptr.3d 225].) From these principles, courts have developed the doctrine of implied findings by which the appellate court is required to infer that the trial court made all factual findings necessary to support the order or judgment. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227]; *Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 494 [61 Cal.Rptr.3d 754]; *Fladeboe, supra*, at p. 58; see also *County of Orange v. Barratt*

*American, Inc.* (2007) 150 Cal.App.4th 420, 439 [58 Cal.Rptr.3d 542] [doctrine of implied findings applies to minute order].)

Applying this doctrine here, we are required to infer from the court's denial of the City's motion that it made the determinations necessary to support its order. The City offers no authority or reason that would justify departing from this doctrine here. It does cite to *Kobzoff, supra,* 19 Cal.4th at page 862, for the proposition that the court is required to make the determinations of good faith and reasonable cause. This requirement, however, is not in dispute; just as the trial court must make the necessary determinations, we must presume that it did so. The issue is whether the court must expressly state its specific findings in the record. *Kobzoff* did not address this question.

■ There are instances where the Legislature has mandated that a trial court express its reasons or factual determinations on the record. However, these situations are rare. When granting a motion for a new trial, for example, the trial court "shall specify the ground or grounds upon which [the motion] is granted and the court's reason or reasons for granting the new trial upon each ground stated." (Code Civ. Proc., § 657.)[17] An order imposing monetary sanctions for frivolous or dilatory actions "shall be in writing and shall recite in detail the conduct or circumstances justifying the order." (Code Civ. Proc., § 128.5, subd. (c).) An order appointing a referee also must be in writing and include "a statement of the reason the referee is being appointed." (*Id.,* § 639, subd. (d)(1).) These statutorily imposed requirements, however, are the exceptions to the general rule that findings of fact are not required in connection with law and motion matters. (See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2007) ¶ 9:301, p. 9(1)-113.) There is nothing in Code of Civil Procedure section 1038 that would require a court to depart from this general rule and express its factual determinations on the record.

Finally, the requirement in Code of Civil Procedure section 1038 that the court *make* the required good faith and reasonable cause determinations does not mean that the court is further required to *explicitly state* such determinations in the record. *Ensworth v. Mullvain* (1990) 224 Cal.App.3d 1105 [274 Cal.Rptr. 447] is instructive on this point. In that case, the trial court issued an injunction against defendant Mullvain pursuant to Code of Civil Procedure section 527.6. That section requires the court to find "by clear and convincing evidence that unlawful harassment exists" before issuing an injunction. (Code Civ. Proc., § 527.6, subd. (d).) The trial court did not make an explicit finding that she was harassing the plaintiff, and Mullvain argued that this was error.

---

[17] Although a trial court is statutorily required to state its reasons for *granting* a motion for new trial, it is not required to specify any reasons for *denying* the same motion. (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 931 [148 Cal.Rptr. 389, 582 P.2d 980].)

The Court of Appeal disagreed, and in language that applies equally here, stated: "The statute does not require the court to make a specific finding on the record that harassment exists . . . . Where the language of a statute is clear, ' "there can be no room for interpretation, and effect must be given to its plain meaning." ' [Citation.] Mullvain does not argue that the statutory language is ambiguous or unclear. Rather, she simply asserts that the court failed to make 'the necessary findings.' [¶] However, the statute does not require a statement of the court's findings of fact, and we have been presented with no other authority requiring such findings. We hold that the granting of the injunction itself necessarily implies that the trial court found that Mullvain knowingly and willfully engaged in a course of conduct that seriously alarmed, annoyed or harassed Ensworth, and that Ensworth actually suffered substantial emotional distress. No further express findings are required. In light of our holdings that (1) the lack of findings is not itself error, and (2) the evidence sufficiently supports the statutory requirements, the judgment is presumed to be correct." (*Ensworth v. Mullvain, supra,* at pp. 1112–1113.) Just as it was necessary for the court in *Ensworth* to make the finding of harassment, it was necessary for the court in the present case to make the determinations of good faith and reasonable cause. And just as the finding of harassment was implied in the granting of the injunction in *Ensworth,* the determinations of good faith and reasonable cause are implied in the denial of the City's motion in this case.[18]

Here, the court unequivocally denied the City's motion. Although the court did not *expressly* state its findings regarding the issues involved in the motion, neither the statute nor other authority required it to do so. Thus, based upon the doctrine of implied findings and the fundamental rules of appellate review upon which it is based, we are required to infer any factual determinations necessary to support the order. Accordingly, we infer that the court determined that that action was brought in good faith and with reasonable cause. Next, we address whether these implied findings are erroneous under the applicable standard of review.

### (c)  *The Merits of the Motion for Defense Costs*

On appeal, the City does not argue that the action was not brought or maintained in good faith. The City focuses only on the element of objective reasonable cause. "*Reasonable cause* is to be determined objectively, as a

---

[18] The dissent would require the court to expressly state its findings on the record based upon what our colleague believes to be the "clear language in the statute." (Conc. & dis. opn., *post,* at p. 1287.) However, as we have explained, although the statute clearly requires the court make certain determinations, it just as clearly does *not* require the court to state those findings explicitly in the record. If the Legislature desired an explicit statement of findings, it needed only say so. It did not.

matter of law, on the basis of the facts known to the plaintiff when he or she filed or maintained the action. Once what the plaintiff (or his or her attorney) knew has been determined, or found to be undisputed, it is for the court to decide ' "whether any reasonable attorney would have thought the claim tenable . . . ." ' [Citation.] Because the opinion of the hypothetical reasonable attorney is to be determined as a matter of law, reasonable cause is subject to de novo review on appeal." (*Knight v. City of Capitola* (1992) 4 Cal.App.4th 918, 932 [6 Cal.Rptr.2d 874].)

The City argues that it established each element of design immunity and, therefore, "because [it] is clearly immune from liability, [plaintiff's] pursuit of her claims was unreasonable as a matter of law." However, a "defendant may not recover [Code of Civil Procedure] section 1038 costs simply because it won a summary judgment or other dispositive motion; victory does not per se indicate lack of reasonable cause. [Citation.] That victory is simply the first step." (*Kobzoff, supra*, 19 Cal.4th at p. 856.)

The City further argues that plaintiff did not have reasonable cause because "the undisputed evidence showed that no dangerous condition of property *owned or controlled by the City* caused or contributed to the accident or plaintiff's injuries." As set forth above, however, the fact that the dangerousness of the intersection was due to obstructions to visibility existing on the adjacent County-owned property did not preclude the City's liability. The City's entitlement to judgment as a matter of law is not based upon its lack of ownership of the northbound lanes, but upon the defense of design immunity. On this issue, we find that the grant of summary judgment, while proper, was not a foregone conclusion; indeed, our decision ultimately turned on the presence of Royer's declaration in the record—a document the City did not even submit in support of its motion. Thus, notwithstanding the eventual grant of summary judgment and our affirmance, we find that an attorney for plaintiff could reasonably have thought the claim tenable.

Because plaintiff's claim was objectively reasonable, the City's motion for fees under Code of Civil Procedure section 1038 was properly denied.

3. *Motion for Expenses Under Code of Civil Procedure Section 2033.420*

Prior to trial, the City requested the following nine matters be admitted by plaintiff:

(1) "The point of impact between the DIMEO VEHICLE and the SPECTER VEHICLE was in the northbound lanes of Ridgecrest Road";

(2) "The point of impact between the DIMEO VEHICLE and the SPECTER VEHICLE was not on public property owned by the City of Victorville";

(3) "The point of impact between the DIMEO VEHICLE and the SPECTER VEHICLE was not on public property controlled by the City of Victorville";

(4) "The SUBJECT ACCIDENT was not legally caused by a DANGEROUS CONDITION of property owned by the City of Victorville";

(5) "The SUBJECT ACCIDENT was not legally caused by a DANGEROUS CONDITION of public property controlled by the City of Victorville";

(6) "Your injuries sustained in the SUBJECT ACCIDENT were not legally caused by a DANGEROUS CONDITION of any property owned by the City of Victorville";

(7) "Your injuries sustained in the SUBJECT ACCIDENT were not legally caused by a DANGEROUS CONDITION of any public property controlled by the City of Victorville";

(8) "The public property where the SUBJECT ACCIDENT occurred is not dangerous if used with due care"; and

(9) "The DIMEO VEHICLE was traveling in the northbound lanes of Ridgecrest Road at all times when it was within 690 feet of the point of impact with the SPECTER VEHICLE."

Plaintiff denied each of these matters.

In the alternative to its motion for fees under Code of Civil Procedure section 1038, the City sought to recover its fees and expenses attributable to proving each of the above matters pursuant to Code of Civil Procedure section 2033.420.[19] The trial court denied the motion.[20] We review the court's ruling

---

[19] Code of Civil Procedure section 2033.420 provides:

"(a) If a party fails to admit the genuineness of any document or the truth of any matter when requested to do so under this chapter, and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees.

"(b) The court shall make this order unless it finds any of the following: [¶] (1) An objection to the request was sustained or a response to it was waived under [Code of Civil Procedure] Section 2033.290. [¶] (2) The admission sought was of no substantial importance. [¶] (3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter. [¶] (4) There was other good reason for the failure to admit."

[20] As with the motion for defense costs under Code of Civil Procedure section 1038, the court did not make explicit any findings or state any reasons for denying the City's alternative

for an abuse of discretion. (*Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 637, fn. 10 [65 Cal.Rptr.2d 532].)

■ Under Code of Civil Procedure section 2033.420, a party that denies a request for admission may be ordered to pay the costs and fees incurred by the requesting party in proving that matter. The court "shall" order the payment of such fees and costs unless it finds: (1) that an objection to the request was sustained or a response to the request was waived; (2) the admission sought was of no substantial importance; (3) the party failing to make the admission had reasonable ground to believe that the party would prevail on the matter; or (4) there was other good reason for the failure to admit the request. (Code Civ. Proc., § 2033.420, subd. (b).)

Plaintiff opposed the City's motion on the ground that the admissions sought were not matters of substantial importance and, if they were, "plaintiff had good reason to deny several of the requests." In addition, plaintiff asserted that many of the fees and costs sought by the City are not attributable to proving the matters for which admission was requested. The same arguments are made on appeal.

A request for admission has "substantial importance when the matter requested for admission [is] central to disposition of the case." (*Brooks v. American Broadcasting Co.* (1986) 179 Cal.App.3d 500, 509 [224 Cal.Rptr. 838] [interpreting Code Civ. Proc., former § 2034].)

In evaluating whether a "good reason" exists for denying a request to admit, "a court may properly consider whether at the time the denial was made the party making the denial held a reasonably entertained good faith belief that the party would prevail on the issue at trial." (*Brooks v. American Broadcasting Co., supra*, 179 Cal.App.3d at p. 511 [interpreting Code Civ. Proc., former § 2034].)

Here, the first three of the requested admissions concern the location of the point of impact; specifically, at a point in the northbound lanes, which are not owned or controlled by the City. The last requested admission seeks an admission that Dimeo was in the northbound lanes as he approached the point of impact. The trial court could reasonably have concluded that the location of impact and the fact that Dimeo had been driving in the northbound lanes were not central to the disposition of the case. That is, as we discussed above, a central issue was whether the City can be liable for an injury even though the injury occurred on property that is not owned or controlled by the City.

motion. Our analysis regarding implied findings concerning Code of Civil Procedure section 1038 applies equally here. As with that section, Code of Civil Procedure section 2033.420 does not require the court to make any explicit findings on the record.

Although we affirm summary judgment on other grounds, we concluded that the City could be liable for an injury that occurs on adjacent property when it had the ability and opportunity to protect against the risk of such injury. The denial of the City's motion for fees with respect to these matters, therefore, was not an abuse of discretion.

The requested admissions that we have numbered (4) through (7) above seek admissions concerning legal causation for the accident and plaintiff's injuries. The eighth requested admission calls for plaintiff to admit that the public property where the accident occurred, i.e., the intersection, is not dangerous if used with due care. The court could have easily concluded that at the time plaintiff refused to admit such matters she reasonably held a good faith belief that she would prevail at trial on these issues. Therefore, the court did not abuse its discretion in denying the City's motion with respect to these matters.

Because the court's denial of the City's alternative motion for fees was not an abuse of discretion, we affirm the court's order.

## V.  DISPOSITION

The judgment is affirmed. The denial of the City's motion for defense costs and expenses is affirmed. Each party shall bear its own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

Miller, J., concurred.

**HOLLENHORST, Acting P. J.,** Concurring and Dissenting.—I concur with the majority opinion affirming the trial court's grant of summary judgment in favor of the City of Victorville (City), but am forced to write separately to question the majority's discussion of the City's liability as an adjacent property owner, the City's request for judicial notice, and the City's motion for attorney fees.

Amanda Laabs (Plaintiff) sued the City and the County of San Bernardino (County), among other parties, as a result of her injuries incurred in an automobile accident on Ridgecrest Road where it intersects with Pebble Beach Drive. Ridgecrest Road is a four-lane north/south roadway. The northbound lanes are owned and controlled by the County. The southbound lanes are owned and controlled by the City. The accident occurred when the northbound vehicle in which Plaintiff was a passenger collided with a westbound left-turning vehicle driven by Dorothy Specter (Specter). Plaintiff alleged that her injuries were caused by a dangerous condition of public property. Both the City and the County moved for summary judgment. The

trial court considered both motions simultaneously. It then granted both motions. Plaintiff appealed.

In Plaintiff's appeal against the County (*Laabs v. County of San Bernardino* (May 11, 2007, E039694) [nonpub. opn.] (*Laabs*)), this court affirmed the granting of summary judgment in favor of the County. Although we found that a triable issue of fact exists as to whether the County was on constructive notice of the sight distance limitation at the intersection and of its dangerousness, we concluded that the County was immune from liability based on its approved plan or design for widening Ridgecrest.

## I. City's Liability for Alleged Dangerous Condition on Adjacent Property

In this appeal, the majority finds that the "present record demonstrates no triable issue of fact as it relates to the applicability of the design immunity." (Maj. opn., *ante*, at p. 1268.) Nonetheless, the majority feels compelled to address the issue of whether the City, as the owner of the southbound lanes, can be liable for an accident on the adjacent County-owned property (northbound lanes) because the addition of the southbound lanes increased the dangerousness of crossing through the intersection. More specifically, the majority states that "the issue is whether the City's liability may be premised on Specter's attempt to use City property (i.e., the southbound lanes) in combination with the existence of a dangerous condition on the adjacent County property (i.e., the northbound lanes)." (*Id.* at p. 1259.) The majority concludes there are sufficient facts in the record to create a triable issue regarding imposition of liability on the City.

I disagree.

To begin with, the City is arguing that no dangerous condition existed. At the trial court level, the City argued that the intersection of Ridgecrest and Pebble Beach was not a dangerous condition as a matter of law. Referencing Government Code section 830, subdivision (a), and citing *Brenner v. City of El Cajon* (2003) 113 Cal.App.4th 434, 439 [6 Cal.Rptr.3d 316] (*Brenner*), the City claimed that "[p]roperty is not 'dangerous' within the meaning of the statutory scheme if the property is safe when used with due care and the risk of harm is created only when foreseeable users fail to exercise due care." In deciding in favor of the City, the trial court found that the City did not own or control the intersection at the time of the accident. On appeal, Plaintiff acknowledges that liability for a dangerous condition of property is premised upon a showing of ownership or control over the dangerous condition. However, she claims the City admitted in its moving papers that the intersection was jointly controlled by the County and the City. I disagree.

According to the City's moving papers, the City stated, "The intersection was jointly controlled by both entities, the County independently owned and controlled the northbound direction of the intersection and the City independently owned and controlled the southbound direction of the intersection. The City had no right, duty or ability to do anything to the northbound section of the intersection." In response, Plaintiff merely argues that the fact that the City only owns the southbound lanes is irrelevant because "[i]t was the City's expansion of Ridgecrest that exacerbated the dangerousness of the intersection, requiring travelers to expose themselves to oncoming traffic for twice as long when attempting to enter Ridgecrest Road."

In its responding brief, the City maintains its liability is premised on whether or not it controlled the northbound lanes. Regarding Plaintiff's claim that the expansion of Ridgecrest Road exacerbated the dangerousness of the intersection, the City aptly notes there was no evidence in the record to support such claim. Plaintiff references the declarations of her engineering experts, Howard Anderson and Robert Crommelin, as well as a resident of the area, Michael Chamberlin. Turning to those declarations, I note that neither expert opined that the widening of the road in 1996 exacerbated or caused the dangerous condition of the intersection. Instead, the expert declarations focused on the sight distance, stopping distance and speed limit for the northbound County-controlled lanes.[1] Likewise, Chamberlin, who declared he had been in three accidents on Ridgecrest Road, failed to attribute the widening of the road by two lanes as the cause.

Nonetheless, Plaintiff attempts to get around this obstacle by arguing that the City may be held liable for an accident which was caused by a dangerous condition on adjacent property. She cites *Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 841 [206 Cal.Rptr. 136, 686 P.2d 656] (*Carson*). In *Carson*, the husband and surviving children of a decedent filed an action after decedent was killed in a car collision at an intersection owned and controlled by the city. (*Id.* at pp. 836–837.) The plaintiffs alleged that a sign and trees located along one side of the road obstructed the visibility of drivers and created a reasonably foreseeable risk of the kind of injuries which were incurred. (*Id.* at p. 837.) The city moved for nonsuit, arguing that, even if the sign created a dangerous condition, the city was not statutorily liable because it did not erect the sign, had no notice of the sign's presence, and there was insufficient evidence of a dangerous condition. (*Id.* at p. 840.) The trial court granted nonsuit; however, the Supreme Court reversed. Our high court held that the ownership and control of the sign was irrelevant to the question of the city's liability as the city property at issue was not the sign, but the intersection that was rendered dangerous by erection of the sign. (*Id.* at

---

[1] Mr. Anderson also claimed that the position of the luminaire contributed to the dangerousness of the intersection.

pp. 841–842.) According to the holding in *Carson*, "Ownership and control of the intersection, not the sign, is the basis of liability . . . ." (*Id.* at p. 842.) In contrast to the facts in *Carson*, here, the City did not own or control the northbound lanes. Rather, it owned the southbound lanes. Thus, I find *Carson* inapplicable.

Faced with this flaw in her argument, in her reply brief Plaintiff argues that "the fact that the City does not own the property where the cars collided does not shield it from dangerous condition liability." She cites, and discusses for the first time, *Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139 [132 Cal.Rptr.2d 341, 65 P.3d 807] (*Bonanno*). The majority relies on *Bonanno*, and *Joyce v. Simi Valley Unified School Dist.* (2003) 110 Cal.App.4th 292 [1 Cal.Rptr.3d 712] (*Joyce*) in finding that there are sufficient facts in the record to create a triable issue regarding imposition of liability on the City.

In *Bonanno*, the plaintiff, a bus patron, was struck by a motorist while crossing a dangerous street in a marked crosswalk at an uncontrolled intersection to get to a bus stop. (*Bonanno, supra*, 30 Cal.4th at p. 145.) The plaintiff sued Contra Costa County and the transit authority, a public entity, alleging that the district's bus stop was a dangerous condition of property under Government Code section 835. The transit authority argued that it did not have control over the location of the bus stop because Contra Costa County, which owned the right-of-way where the bus stop was located, had "a veto power over any proposal for a new stop on [the county's] property." (*Bonanno, supra*, 30 Cal.4th at p. 147.) The *Bonanno* court rejected the transit authority's claim that it could not "be liable for an injury occurring on property (the street) it neither owned nor controlled." (*Id.* at p. 151.) Instead, it found that the transit authority "owned and controlled its own bus stop, and a condition of *that* property, its physical situation, caused users of the bus stop to be at risk from the immediately adjacent property." (*Ibid.*) The court explained that, regardless of whether the transit authority needed the county's permission as to locating bus stops, the transit district "enjoyed sufficient sole control over the bus stop to *remove* it if it was unnecessarily dangerous." (*Id.* at p. 147, fn. 2.)

Regarding the applicability of *Bonanno,* I find the unique facts in that case make it inapplicable in this case. To begin with, the *Bonanno* court found that it was feasible for the transit authority to move or remove the bus stop. (*Bonanno, supra*, 30 Cal.4th 139, 152.) Here, it is not feasible to relocate the southbound lanes. Moreover, there is no evidence that the City had any control over the location or design of the Pebble Beach entrance to Ridgecrest Road on the County's property.

Second, the *Bonanno* decision was very narrowly decided, addressing only the existence of one aspect of a dangerous condition and assuming the existence of a dangerous condition of the crosswalk. (*Bonanno, supra*, 30 Cal.4th 139, 151, 154–155.) The court found that the location of the bus stop caused users to be at risk from the adjacent dangerous intersection. (*Id.* at p. 151.) However, the court cautioned: "Our decision here, we emphasize, *does not concern the question whether the crosswalk . . . was in fact an unsafe pedestrian route for crossing* [the road] . . . . As the [c]ounty, which controlled the intersection, settled with [the] plaintiff before trial, our decision does not in any respect address the liability of a city or county for maintenance of an unsafe crosswalk. To be sure, [the] plaintiff introduced evidence—which the jury apparently found persuasive—showing the DeNormandie crossing was more dangerous than that at Morello, in order to establish that [the transit authority] should have moved its bus stop to Morello. But the sufficiency of that evidence is not before this court. Our order limiting review, quoted earlier in this opinion, *assumes the existence of a dangerous crosswalk*, posing only the question whether a *bus stop* may be deemed dangerous because bus users, to reach the stop, *must cross at that dangerous crosswalk.*" (*Id.* at pp. 146–147, first, second and fourth italics added, third italics in original.)

Here, I do not begin with the assumption that the intersection constituted a dangerous condition. There are millions of intersections throughout the United States that are similar to the one in this case. As the City noted at the trial level, "Property is not 'dangerous' within the meaning of the statutory scheme if the property is safe when used with due care and the risk of harm is created only when foreseeable users fail to exercise due care." To assume that this intersection was dangerous given the facts of this case would negate the statutory scheme behind Government Code section 830. (*Brenner, supra*, 113 Cal.App.4th at p. 439.) It was not the intersection itself that constituted a dangerous condition. Rather, it was the fact that the vehicle (in which Plaintiff was a passenger) was being driven by an individual who failed to use due care. As the majority correctly notes, the trial court merely found the existence of a triable issue of fact as to whether the intersection created a foreseeable risk of injury to members of the motoring public " 'using due care.' " (Maj. opn., *ante*, at p. 1260, fn. 8.) Likewise, I do not assume that the addition of the southbound lanes created, or exacerbated, any dangerous condition.

Moreover, the issue to be decided in this case is the opposite of the issue decided in *Bonanno*. (*Brenner, supra*, 113 Cal.App.4th at 442.) *Bonanno* addressed whether adjacent property (location of a bus stop) was dangerous because of the route (crosswalk on busy road) necessarily traveled by its patrons. In contrast, Plaintiff's complaint addresses whether the route (northbound lanes) traveled by patrons was dangerous because of the adjacent

property (southbound lanes and the need of Specter's vehicle to cross the northbound lanes in order to get to the southbound lanes). *Bonanno* did not address the issue raised by Plaintiff in this case. Again, as I noted above, *Bonanno* assumed the existence of a dangerous condition of the route traveled by its patrons. Here, at best, there is a triable issue of fact.

Similarly, I do not find *Joyce* applicable. In that case, the defendant's liability was based on its "failure to provide adequate safeguards against a *known dangerous condition*." (*Joyce, supra,* 110 Cal.App.4th at p. 300, italics added.) In *Joyce,* a student was seriously injured when she was struck by a car while crossing the street to enter the school grounds through an open school yard gate. Finding the facts similar to those in *Bonanno,* the *Joyce* court noted that while defendant "did not control the crosswalk, it did control whether an opening in the fence should be made. The open gate was built next to the crosswalk to encourage students to cross at an uncontrolled intersection. It diverted children from a safer, signal-controlled intersection less than 500 feet away. . . . [A] reasonable trier of fact could find that the open gate was a dangerous condition that could have been remedied by simply closing the fence opening and directing students to cross at the signal. [Citation.]" (*Joyce, supra,* at p. 299, fn. omitted.) My reasons for finding *Bonanno* inapplicable equally apply to *Joyce.* In *Joyce,* the defendant controlled the opening in the fence, there was no question as to whether the crosswalk constituted a dangerous condition, and the *Joyce* court did not address the issue raised by Plaintiff.

Given the record before this court, and for the reasons stated above, I disagree with the majority's conclusion that "liability may be imposed on the City for an alleged dangerous intersection even though the initial impact occurred on County property and the obstructions to visibility existed on the County side of Ridgecrest." (Maj. opn., *ante,* at p. 1262.) The City does not own or control the northbound lanes, nor is there any evidence that the expansion of Ridgecrest Road from a two-lane to a four-lane road made the intersection dangerous, or exacerbated any alleged dangerous condition that may exist on the County-controlled northbound lanes. Again, the issue is whether the intersection created a foreseeable risk of injury to members of the motoring public "using due care." Here, the individual using the intersection was speeding, i.e., he was traveling in excess of 74 miles per hour.

## II. City's Request for Judicial Notice

Regarding the majority's discussion of the City's request for judicial notice, I note that my colleagues correctly recognize the procedures and the law governing what evidence may be considered in support of, or opposition to, a motion for summary judgment. However, in the context in which the

City's motion was brought, argued, and considered, I find that the letter and the spirit of the law governing motions for summary judgment were observed.

Turning to the record, it is clear to me that the City's liability, if any, is tied to the County's liability. To that end, I would begin the analysis by considering the City's request for judicial notice of certain court records. On October 11, 2007, the City requested this court take judicial notice of (1) certain court documents contained in the appellate record of the County's related case decided by this court (*Laabs, supra*, E039694), including, but not limited to, various declarations and evidence supporting the County's motion for summary judgment; (2) the unpublished opinion of this court in *Laabs, supra*, E039694, issued on May 11, 2007; and (3) a copy of the declarations of McGlade and Ruzak with a minimized copy of exhibit A to those declarations and a minimized copy of exhibit 1 to the notice of lodgment, as submitted to the trial court in support of the City's motion for summary judgment. The majority granted the City's request pursuant to Evidence Code sections 452, subdivision (d), and 459, subdivision (a); however, the majority took judicial notice of the *"existence* of the documents in court files, . . . not . . . the truth of the facts asserted in such documents." (Maj. opn., *ante*, at p. 1266.) In support of this decision, the majority cites *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564–1565 [8 Cal.Rptr.2d 552] (*Sosinsky*).

The *Sosinsky* court noted that several cases have cited to, and followed, Jefferson's California Evidence Benchbook, which explained the meaning of judicial notice: " 'A court may take judicial notice of the *existence* of each document in a court file, but can only take judicial notice of the *truth* of facts asserted in documents such as orders, **findings of fact** and conclusions of law, and judgments.' " (*Sosinsky, supra*, 6 Cal.App.4th at p. 1564, quoting 2 Jefferson's Cal. Evidence Benchbook (Cont.Ed.Bar 2d ed. 1982).) However, the *Sosinsky* court critically analyzed whether a court may take judicial notice of the *truth* of a finding of fact and concluded that it cannot. (*Sosinsky, supra*, at pp. 1564–1569.) Relying on the *Sosinsky* holding, the majority declines to take judicial notice of the trial court's order or findings of fact, as well as this court's findings and conclusion in our prior opinion in Plaintiff's related case against the County.

I disagree. Given the unique facts in this case, I would take judicial notice of the trial court's findings and conclusions with respect to the County, as well as our prior opinion affirming those findings and conclusions. (*Kilroy v. State of California* (2004) 119 Cal.App.4th 140 [14 Cal.Rptr.3d 109] (*Kilroy*).)

In *Kilroy*, the plaintiffs sued the state and a California Highway Patrol officer claiming a violation of their civil rights and other related torts on the

grounds that the officer wrongly omitted material facts from an affidavit used to obtain a search warrant for their business. (*Kilroy, supra,* 19 Cal.App.4th at p. 142.) The search produced firearms and resulted in a federal prosecution. The federal judge granted the plaintiffs' motion to suppress evidence and dismissed the charges. (*Ibid.*) In the state court action, the plaintiffs requested judicial notice of the federal court's suppression order. The trial court denied the request and granted summary judgment in favor of the state. (*Ibid.*) The plaintiffs appealed, arguing that the trial court erred in denying their request for judicial notice. (*Ibid.*) On appeal, our colleagues in the Third District held that while the factual findings in the federal order are not a proper subject of judicial notice, they "may be a proper subject of judicial notice if [they] ha[ve] a res judicata or collateral estoppel effect in a subsequent action." (*Id.* at p. 148.) Such is the case here.

Nonetheless, the majority points out, "Our sole function 'is to determine *from the submitted evidence* whether there is a "triable issue as to any material fact". . . .'" (Maj. opn., *ante,* at p. 1266.) Additionally, my colleagues emphasize Plaintiff's due process right to be informed of the evidence that needs to be disputed in order to defeat the City's motion. While the evidence submitted by the County was not included in the paperwork offered by the City, the record before this court shows that Plaintiff's due process right was not overlooked, nor was there any request to limit the submitted evidence to only that offered in the City's moving papers and Plaintiff's opposition thereto.

I find that the majority overlooks the context in which both of these motions for summary judgment were heard. Both motions were brought and argued simultaneously. Neither side demanded, or even expected, the trial court to limit its consideration of all of the evidence presented in support of, and in opposition to, each motion when reaching a decision as to either motion. In fact, the City specifically stated that its motion was based upon everything which it had filed, plus "such oral arguments and evidence which the court permits at its hearing on this motion." Likewise, the County based its motion on "such further oral and documentary evidence as may be presented at the hearing of this motion." Even Plaintiff stated that her opposition was based upon what she had filed, plus "the pleadings on file with the Court, declarations, depositions and matters of which the Court may take judicial notice, and such argument as may be made at the hearing on this matter." To that end, at oral argument each party addressed the issues without segregation. In fact, Plaintiff's arguments against both the County and the City are substantially similar. Many times in her appellate briefs, Plaintiff mistakenly referred to the County when she meant the City.

Clearly, the trial court considered all of the evidence before it without regard as to which party was responsible for submitting such evidence. Given

the nature in which the motions were addressed to the trial court, at one point, the trial court stated: "My tentative management approach is that I'm gonna [*sic*] vacate the submission on the County and the City's motion for summary judgment and try that case without a jury. That is the affirmative defense of design immunity. [¶] Now, if everybody has everything that they want to present as evidence in the motions for summary judgment, I will take that as a trial submitted on the declarations; otherwise, I will take whatever additional evidence anybody wants to offer and try that issue at a date that is convenient to all the parties to get ready for that." In response, Plaintiff's counsel stated "The plaintiff's prepared. We've submitted everything that we have been given possession of relative to the design immunity." Following further discussion, however, the County and the City preferred to have a ruling on their respective motions. Nonetheless, everyone contemplated that everything, including evidence and argument offered by any party before the court, could be considered by the court in making its decision.

Furthermore, regarding Plaintiff's appeal concerning the County, Plaintiff designated a comprehensive record. In this appeal, she "incorporate[s] that record by reference . . . pursuant to California Rules of Court, [r]ule 10[b]." In Plaintiff's reply brief (which was filed after we had filed our opinion in Plaintiff's appeal involving the County), Plaintiff notes that this court had "found that the intersection's *accident history creates a triable fact question* as to whether the County was on notice of the intersection's condition and dangerousness [*Laabs, supra*, E039694]." She further notes in a footnote, "This holding is citable under rule 8.1115[b], California Rules of Court, because it is relevant under the doctrine of law of the case." She then argues that the "same history creates a triable fact question as to notice to the City." Using Plaintiff's legal reasoning, I am convinced that our prior finding of design immunity as to the County applies equally to the City. (*Laabs, supra*, E039694; *Kilroy, supra*, 19 Cal.App.4th at p. 148.)

Finally, to the extent the City failed to provide sufficient evidence of the reasonableness of the design as to the northbound lanes, such failure is due to the fact that no party claimed the City owned or controlled the northbound lanes. According to the pleadings, there was no reason for the City to address an issue (design of the northbound lanes) that did not apply to it. I find that issue was (and is) best addressed by the entity (the County) which owned and controlled those lanes, and thus, is charged with its design.

### III. City's Motion for Attorney Fees

#### A. *Code of Civil Procedure section 1038*

After the City won its summary judgment motion, it filed a motion to recover attorney fees and costs under Code of Civil Procedure section 1038.

"Code of Civil Procedure section 1038 ' "provides public entities with a protective remedy for defending against unmeritorious litigation." ' [Citation.] The statute permits public entities to recover costs, including attorney fees, from a plaintiff who files a frivolous civil action under the California Tort Claims Act after a defendant prevails on a motion for summary judgment, directed verdict, or nonsuit. [Citations.]

"In order to recover fees under Code of Civil Procedure section 1038, the court must ' "determine whether or not the plaintiff, . . . brought the proceeding with reasonable cause and in the good faith belief that there was a justiciable controversy under the facts and law which warranted the filing of the complaint." ' [Citation.] 'Reasonable cause' is an objective standard which asks whether any reasonable attorney would have thought the claim tenable. [Citation.] 'Thus, before denying a [Code of Civil Procedure] section 1038 motion, a court *must* find the plaintiff brought or maintained an action in the good faith belief in the action's justifiability and with objective reasonable cause.' [Citation.]

"The standard of review of an award of attorney fees under Code of Civil Procedure section 1038 is both de novo and substantial evidence. The 'reasonable cause' prong is reviewed de novo, and the 'good faith' prong is reviewed for substantial evidence. [Citation.]" (*Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 887–888 [57 Cal.Rptr.3d 454], italics added.)

Here, as the majority points out, following the October 17, 2005, hearing on the City's motion for costs and attorney fees, the trial court took the matter under submission. Thereafter, the trial court issued a minute order denying the motion "without prejudice subject to the outcome of the appeal." The City renewed its motion, explaining that Code of Civil Procedure section 1038, subdivision (c), requires a motion for attorney fees to be brought before entry of judgment or they will be waived. A hearing was held on January 30, 2006. The trial court indicated its preference to deny the motion, not on the merits of the motion, but because an appeal was anticipated. The court again took the matter under submission. On February 10, 2006, the trial court issued a simple order denying the motion for attorney fees with prejudice.

On appeal, the City contends the trial court "abdicated its duty under this statute in refusing to make a ruling on the merits of the City's motion . . . ." The City argues that the trial court was required "to make a determination of

whether [P]laintiff's action was brought or maintained *both* in the good faith belief in the action's justifiability *and* with objective reasonable cause. [Citation.]" I agree; however, the majority does not. The majority affirms the trial court's decision by implying findings necessary to support the ruling. In doing so, the majority discounts the clear language in the statute: "In any civil proceeding under the California Tort Claims Act . . . the court, upon motion of the defendant . . . *shall*, at the time of the granting of any summary judgment . . . under Section 631.8 . . . determine whether or not the plaintiff . . . brought the proceeding with reasonable cause and in the good faith belief that there was a justifiable controversy under the facts and law which warranted the filing of the complaint . . . ." (Code Civ. Proc., § 1038, subd. (a), italics added.)

In support of their claim that the trial court was not required to *expressly* state its findings regarding the issues involved in the City's motion for attorney fees, and that any findings necessary to support the order are implied in the denial, my colleagues cite the doctrine of implied findings "by which the appellate court is required to infer that the trial court made all factual findings necessary to support the order or judgment. [Citations.]" (Maj. opn., *ante*, at p. 1271.) The cases cited in support of their use of this doctrine are: *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1132–1133, 1137 [275 Cal.Rptr. 797, 800 P.2d 1227] (discussing Code Civ. Proc., §§ 632 & 634, the court held that "a litigant who fails to bring to the attention of the trial court alleged deficiencies in the court's statement of decision waive[s] the right to complain of such errors on appeal, thereby allowing the appellate court to make implied findings in favor of the prevailing party"); *Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 494 [61 Cal.Rptr.3d 754] (discussing Code Civ. Proc., §§ 632 & 634); *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58 [58 Cal.Rptr.3d 225] (*Fladeboe*) (discussing Code Civ. Proc., §§ 632 & 634); *County of Orange v. Barratt American, Inc.* (2007) 150 Cal.App.4th 420, 439 [58 Cal.Rptr.3d 542] (discussing doctrine of implied findings and *Fladeboe*); and *Ensworth v. Mullvain* (1990) 224 Cal.App.3d 1105, 1109, 1112 [274 Cal.Rptr. 447] (*Ensworth*) (discussing Corp. Code, § 25612 and Code Civ. Proc., § 527.6 with the court holding that statute that authorized an injunction if the judge " 'finds by clear and convincing evidence that unlawful harassment exists,' " did not "require the court to make a specific finding on the record" prior to issuing injunction, but was satisfied by finding "necessarily implie[d]" by the issuance of injunction itself). None of these cases discuss the actual statute in question.

The majority finds the decision in *Ensworth* to be instructive on interpreting Code of Civil Procedure section 1038. The *Ensworth* case involved a patient stalking her psychologist. Following a series of harassing incidents,

the psychologist (Ensworth) sought and obtained a restraining order. (*Ensworth, supra,* 224 Cal.App.3d 1105, 1108.) At the expiration of the order, Ensworth sought a second restraining order. A hearing was held wherein Ensworth testified that the prior order reduced the incidents of harassment, nonetheless, incidents continued to occur. Ensworth provided a letter from her former patient (Mullvain) which stated that she would continue to violate the restraining order, would go to jail, and would do "whatever necessary to continue to have contact with Ensworth . . . ." (*Ibid.*) In response, Mullvain testified that she was unable to do her job as a result of the restraining order and thus had lost money and referrals. (*Id.* at pp. 1108–1109.) During closing argument, Mullvain argued that Ensworth failed to present any evidence on whether she suffered emotional damage. The trial court disagreed, finding that Code of Civil Procedure section 527.6 only required a showing of emotional damage " 'to a reasonable person.' " (224 Cal.App.3d at p. 1109.) Thus, a second restraining order was issued. (*Id.* at pp. 1107–1108.)

On appeal, Mullvain claimed, inter alia, that the trial court erred in failing to make the necessary findings under the statute. (*Ensworth, supra,* 224 Cal.App.3d at p. 1109.) "[Code of Civil Procedure] [s]ection 527.6 provides a procedure by which a person who has suffered harassment may seek an injunction prohibiting the harassment. In subdivision (b), harassment is defined as 'a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, or harasses the person, and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the plaintiff.' " (*Ibid.*) Subdivision (d) of section 527.6 provides that " 'the judge shall receive such testimony as is relevant, and may make an independent inquiry. If the judge finds by clear and convincing evidence that unlawful harassment exists, an injunction shall issue prohibiting the harassment.' " (224 Cal.App.3d at p. 1112.) Mullvain complained that the trial court failed to find a continuous course of conduct and emotional distress. (*Ibid.*) The appellate court rejected the complaint, finding that "[t]he statute does not require the court to make a specific finding on the record that harassment exists, nor does it require specific findings of the statutory elements of harassment as defined in subdivision (b)." (*Ibid.*) The court held that "the granting of the injunction itself necessarily implies that the trial court found that Mullvain knowingly and willfully engaged in a course of conduct that seriously alarmed, annoyed or harassed Ensworth, and that Ensworth actually suffered substantial emotional distress." (*Ibid.*)

Applying the above, my colleagues conclude that just as the *Ensworth* court necessarily found harassment, so too did the trial court in this case make the determinations of good faith and reasonable cause. The majority

thus finds that the trial court's unequivocal denial of the City's motion without expressly stating its findings complies with the statute.

I disagree. Given the language used in Code of Civil Procedure section 1038, the case law interpreting the statute, and the statements in the legislative committee reports concerning the statute's objects and purposes, I find that the trial court is required to state its findings on the record.

In 1980, the Legislature enacted Code of Civil Procedure section 1038. "In enacting the act which added section 1038 to the Code of Civil Procedure (Assem. Bill No. 3214, introduced by Assemblyman Patrick J. Nolan on Mar. 11, 1980, which became Stats. 1980, ch. 1209, § 1, pp. 4088–4089), the Legislature appears to have intended to discourage frivolous lawsuits against governmental agencies. For instance, an analysis prepared for the Senate Committee on the Judiciary stated: 'The purpose of the bill is to allow public entities to recover the cost of defending frivolous lawsuits brought against them.' A Bill Digest of the Assembly Committee on the Judiciary stated: 'Proponents contend that this bill will curb frivolous lawsuits because it will require plaintiffs who bring such actions to pay for some of the expense incurred by blameless defendants.'

"Statements in Legislative committee reports concerning statutory objects and purposes which are in accord with a reasonable interpretation of the statute serve as legitimate aids in determining Legislative intent. [Citation.] It will be presumed that the Legislature adopted the proposed legislation with the intent and meaning expressed in committee reports. [Citations.]

"The above-quoted statements which appear in the committee reports disclose that the purpose of Assembly Bill No. 3214, which became Code of Civil Procedure section 1038, was to allow public entities to recover costs incurred in defending frivolous lawsuits. . . . [¶] . . . [¶]

"Subdivision (c) of section 1038 provides that any party requesting defense costs under the statute waives any right to seek damages for malicious prosecution and that failure to seek such relief shall not be deemed a waiver of the right to pursue a *malicious prosecution* action. The waiver provisions in subdivision (c) show a recognition by the Legislature that the relief afforded by section 1038 is so similar to a *malicious prosecution* cause of action that an aggrieved party can only seek redress by one method or the other, but not both. [¶] . . . [¶]

"Inasmuch as the Legislature provided in subdivision (c) of section 1038 that a request for relief pursuant to the section operates as a waiver of a malicious prosecution action, we presume the Legislature intended that section

1038 would provide a means of redress for acts similar to those for which damages are sought in a civil malicious prosecution action." (*Curtis v. County of Los Angeles* (1985) 172 Cal.App.3d 1243, 1249–1251 [218 Cal.Rptr. 772].)

Given the above, a Code of Civil Procedure section 1038 motion takes the place of a malicious prosecution action. However, through the years, the statute has been amended. As our state's highest court noted in 1998, "The [Code of Civil Procedure] section 1038 proceeding was not always a summary one. In its original version, section 1038, subdivision (a), directed the 'fact finder' to decide whether the action was brought with 'reasonable cause' and in 'good faith.' Under section 1038, subdivision (b), the trial court could 'direct a separate trial at the conclusion of the proceeding on the issue of defense costs.' [Citation.] The 1986 amendment to section 1038, however, directed 'the court,' rather than the 'fact finder' to determine whether the statutory elements were present, and eliminated the court's power to order a separate trial on the question. [Citation.]" (*Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 857 [80 Cal.Rptr.2d 803, 968 P.2d 514] (*Kobzoff*).)

Until this case, other appellate courts and our state's highest court recognized that Code of Civil Procedure section 1038 "initially requires the trial court to determine whether [a plaintiff has] acted with reasonable cause and in the good faith belief that the law and facts stated a justifiable controversy."[2] (*Kobzoff, supra,* 19 Cal.4th 851, 861; see *Austin B. v. Escondido Union School Dist., supra,* 149 Cal.App.4th at pp. 887–888; *Carroll v. State of California* (1990) 217 Cal.App.3d 134, 140 [265 Cal.Rptr. 753].) To that end, our state Supreme Court has said that "before denying a [Code of Civil Procedure] section 1038 motion, a court must find the plaintiff brought or maintained an action in the good faith belief in the action's justifiability and with objective reasonable cause. [Citations.]" (*Kobzoff, supra,* at p. 862.) I agree with the overwhelming express and implicit views of the other California appellate courts which have addressed this issue and find the language in the statute to be clear and *mandatory.* The trial court must determine whether Plaintiff brought or maintained the action in the good faith belief in the action's justifiability and with objective reasonable cause. Because the trial court failed to state whether or not it had found that Plaintiff brought or maintained her action in the good faith belief in the action's justifiability and with objective reasonable cause, I would reverse the order and remand for further proceedings with the directions that the trial court comply with the statutory requirements and state its findings on the record.

---

[2] Even the appellate court in the *Kobzoff* case remanded the case to the trial court for further factual findings on " 'the issue of plaintiffs' bad faith in bringing and maintaining the action.' " (*Kobzoff, supra,* 19 Cal.4th 851, 855.)

### B. *Code of Civil Procedure Section 2033.420*

Alternatively, the City sought discovery sanctions pursuant to Code of Civil Procedure section 2033.420 for Plaintiff's failure to admit a request for admission of a fact which was later proven to be true. Code of Civil Procedure section 2033.420 provides: "(a) If a party fails to admit the genuineness of any document or the truth of any matter when requested to do so under this chapter, and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees.

"(b) The court shall make this order unless it finds any of the following:

"(1) An objection to the request was sustained or a response to it was waived under Section 2033.290.

"(2) The admission sought was of no substantial importance.

"(3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter.

"(4) There was other good reason for the failure to admit."

The trial court denied the City's request without making any explicit findings or stating any reasons. The City appeals and my colleagues find that explicit findings were unnecessary.

I disagree.

As the majority notes, we review the court's findings for an abuse of discretion. (*Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 637, fn. 10 [65 Cal.Rptr.2d 532].) However, because the trial court failed to state its findings, there is nothing for us to review. Accordingly, I would reverse the order and remand for further proceedings with the directions that the trial court comply with the statutory requirements and state its findings on the record.

For the above reasons, I concur only with the majority opinion affirming the trial court's grant of summary judgment in favor of the City.

A petition for a rehearing was denied July 7, 2008, and the opinion was modified to read as printed above.